STATE OF NORTH CAROLINA v. RONALD SHELDON THOMAS

No. 501A91

(Filed 19 November 1992)

**1. Appeal and Error § 443 (NCI4th)— issues reviewed— assignments of error**

The scope of appellate review is limited to those issues presented by assignment of error set out in the record on appeal. Where no assignment of error corresponds to an issue presented, that issue is not properly presented for review by the appellate court. N.C. R. App. P. 10(a).

**Am Jur 2d, Appeal and Error §§ 491, 493.**

STATE v. THOMAS

[332 N.C. 544 (1992)]

2. **Rape and Allied Offenses § 5 (NCI3d) — first degree sexual offense — fatal injury — other serious personal injury**

The State presented sufficient evidence of serious personal injury other than the fatal one to support defendant's conviction of first degree sexual offense where the evidence tended to show that the victim suffered serious external injuries from a savage beating by defendant, that none of the victim's serious external injuries, as testified to by the pathologist and another witness, were the cause of her death, and that all of the external injuries were inflicted upon the victim immediately prior to and during a sexual assault upon her by defendant.

**Am Jur 2d, Assault and Battery § 41.**

**What constitutes offense of "sexual battery." 87 ALR3d 1250.**

3. **Homicide § 253 (NCI4th) — first degree murder — sufficient evidence of premeditation and deliberation**

The State's evidence was sufficient to support the jury's verdict finding that defendant killed the victim with premeditation and deliberation where it tended to show that, while in defendant's truck, defendant grabbed the victim's breast, at which time the victim "backhanded" defendant; defendant knocked the victim back into the sleeper portion of the truck and began beating the victim about the head and face; when he saw the victim's blood, he became more enraged and continued to beat her; fearing that she was going to be raped, the victim removed her clothing; defendant bit the victim's breasts until they were bleeding and then inserted his fingers into her vagina; the entire time the assault was occurring, the victim was fighting, kicking, and screaming; defendant reached for a hand cleaner on the floorboard and, after lubricating his hands with it, penetrated the victim with his entire hand to a point past his wrist at least twice; defendant tore out the wall between the victim's vaginal and anal openings and proceeded to tear out part of the victim's colon and right kidney; when the victim attempted to crawl from the truck and fell to the ground, defendant dragged her into the woods some 120 feet on her back and left her helpless and

STATE v. THOMAS

[332 N.C. 544 (1992)]

bleeding to death; defendant made no attempt to obtain assistance for the victim; the victim was conscious for some amount of time after being left to die; and defendant thereafter cleaned up his truck, resumed his delivery route, and slept before his next delivery. The victim's act of slapping defendant did not constitute provocation because the mere repelling of a sexual assault does not constitute provocation.

**Am Jur 2d, Homicide § 439.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

4. **Homicide § 552 (NCI4th)— first degree murder—instruction on second degree not required**

There was no evidence in a first degree murder prosecution showing a lack of premeditation, deliberation, and intent to kill so as to require the trial court to instruct the jury on second degree murder where the evidence tended to show that, while in defendant's truck, defendant grabbed the victim's breast, at which time the victim "backhanded" defendant; defendant began beating the victim about the head and face; fearing that she was going to be raped, the victim removed her clothing; defendant bit the victim's breasts until they were bleeding; defendant placed four fingers into the victim's vagina, then lubricated his hands with a hand cleaner, and inserted his hand past his wrist into the victim's vagina at least twice, tearing out a part of the victim's colon and right kidney; defendant later dragged the victim 120 feet into the woods and left her helpless and bleeding to death; and defendant thereafter cleaned up his truck, resumed his delivery route, and slept before his next delivery. Even if defendant had not formed an intent to kill at the time the assault began, no rational juror could have reasonably found that defendant, having beaten the victim into submission, inserted his hand into the victim's vagina and pulled out the victim's organs, did not act with premeditation and deliberation when he later dragged her into the woods and left her helpless and bleeding to death.

**Am Jur 2d, Trial §§ 1430, 1431.**

5. **Homicide § 552 (NCI4th)— first degree murder—mitigating circumstances—emotional disturbance and impaired capacity— premeditation and deliberation not negated**

The jury's findings as mitigating circumstances for first degree murder that defendant was under the influence of a mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired did not negate premeditation and deliberation so as to require an instruction on second degree murder where there was no evidence that defendant's emotions overcame his ability to reason.

**Am Jur 2d, Homicide § 552.**

6. **Homicide § 489 (NCI4th)— premeditation and deliberation— lack of provocation—propriety of instruction**

The trial court did not err in instructing the jury in a first degree murder case that it could infer premeditation and deliberation from lack of provocation by the victim because all of the evidence at trial revealed no provocation on the part of the victim where it tended to show that defendant began his assault on the victim by an unsolicited and nonconsensual fondling of her breasts; the victim responded by slapping the defendant; and defendant then proceeded to beat the victim into submission and sexually abused her to the point that she died. The victim's act of slapping defendant did not constitute provocation since the act of repelling a sexual assault does not constitute provocation under North Carolina law.

**Am Jur 2d, Homicide §§ 263, 264.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435, sec. 1.**

7. **Homicide § 43 (NCI4th)— felony murder rule—due process and equal protection**

The felony murder rule set out in N.C.G.S. § 14-17 does not establish a presumption of premeditation and deliberation in violation of due process and equal protection because premeditation and deliberation are not elements of felony

murder, and thus the statute involves no presumption of such.

**Am Jur 2d, Homicide § 269.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence upon defendant's conviction of first-degree murder entered by Fullwood, J., at the 25 February 1992 Criminal Session of Superior Court, New Hanover County. Defendant's motion to bypass the Court of Appeals, pursuant to N.C.G.S. § 7A-31, as to his first-degree sexual offense conviction, for which he received a consecutive sentence of life imprisonment, was allowed by this Court on 7 February 1992. Heard in the Supreme Court 8 September 1992.

*Lacy H. Thornburg, Attorney General, by John H. Watters, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

On 12 March 1990, defendant was indicted for the first-degree sexual offense and first-degree murder of Talana Quay Kreeger. Defendant was tried capitally in Superior Court, New Hanover County, in February and March 1991 and was found guilty of all charges. The jury returned verdicts finding defendant guilty of first-degree sexual offense, as well as first-degree murder based on the theories of premeditated and deliberated murder and felony murder. Following a sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury determined that the fourteen mitigating circumstances found were sufficient to outweigh the two aggravating circumstances found and accordingly recommended a sentence of life imprisonment. In accordance with the jury's recommendation, the trial court sentenced defendant to life imprisonment for murder, as well as a consecutive life sentence for the first-degree sexual offense conviction.

On appeal, defendant brings forward numerous assignments of error. After a thorough review of the transcript of the proceedings, record on appeal, briefs, and oral arguments, we conclude

STATE v. THOMAS

[332 N.C. 544 (1992)]

that defendant received a fair trial, free of prejudicial error, and we therefore affirm his convictions and sentences.

The evidence presented by the State tended to show the following facts and circumstances. On the evening of 21 February 1990 at approximately 11:00 or 11:30 p.m., defendant, a long-distance truck driver, stopped at the Park View Grill, a bar in Wilmington. Wanda Whitley, the owner of the Park View Grill, and Talana Kreeger, the victim, were sitting at the bar discussing plans for the next day to remodel the back room of the bar. Kreeger was a carpenter who worked for Laney Builders and worked odd jobs on the side. Heidi Crossley, Whitley's roommate, was also at the bar. Defendant was seated two seats away from Crossley, and during the evening, they began to converse. At some point, defendant and Crossley went into the back room to shoot pool. Later in the evening, Whitley and the victim went to the back room, and Whitley commented on defendant's truck. Defendant offered Whitley and the victim his keys to go look at his truck. After looking at the truck, Whitley and the victim returned to the bar.

When the bar closed that evening, the victim, Whitley, Crossley, and defendant discussed going to get something to eat. Whitley suggested they go to Hardee's on Carolina Beach Road, which was roughly one and a half to two miles away. At approximately 1:30 a.m., the victim and defendant left in his truck. The victim went with defendant because she had never ridden in a tractor-trailer truck before. Crossley left immediately after defendant and the victim and stopped at her house briefly before going to Hardee's. When she did not see anyone at Hardee's, she went home and went to sleep.

Whitley left Park View Grill approximately ten or fifteen minutes after the victim and defendant. When Whitley got to Hardee's, she found no one there. Whitley immediately began looking for the truck defendant was driving. After searching during the early morning hours of 22 February 1990, without success, she called Hoggard High School because she recalled that defendant had said he had a fruit delivery to make to the school. While on the phone, Whitley spoke to a man who was identified to her as a trucker making a delivery at Hoggard High School and who said his name was Ron. Ron denied knowing her friend Talana Kreeger or having been in the Park View Grill the previous night. Whitley eventually went to Hoggard High School and spoke with

Jerry Cribbs, who showed her a bill of lading that had the name of defendant and the company for which he worked.

On 22 February 1990 at approximately 10:30 a.m., Kenneth Spivey, a minister who lives in Dunn, North Carolina, received a telephone call from a man he later learned was defendant. Defendant told him, "I need some help" because "I've done something terrible." Spivey responded that the Lord could forgive him. Upon further inquiry, defendant informed Spivey that the Lord could not forgive him because he had beaten a woman. Spivey then asked defendant if he had killed her, and defendant said "Yes." Spivey told defendant that he would meet him but that he was bringing along a deputy sheriff.

Spivey and Deputy Lymon McLean met defendant at Robinhood Truck Stop off of Interstate 95. Defendant got into the patrol car and proceeded to tell McLean and Spivey that he had beaten a woman and that when he left her, she was conscious. Defendant stated that he beat the woman because she started "mouthing" and "reminded him of his ex-wife." Once defendant admitted that he had killed a woman, McLean asked him if he knew her name. In response, defendant pulled a check out of his shirt pocket and gave it to McLean. The check was made out to Carolina Builders and was signed by Wanda Whitley. Later, McLean asked defendant what the woman was wearing, and defendant said that her clothes were in the truck. At McLean's request, defendant retrieved the victim's clothing and gave it to McLean. A search of the victim's pocketbook revealed multiple driver's licenses belonging to Talana Kreeger. McLean called the Wilmington Police Department and reported the victim's name. Defendant also told McLean the location of the victim, which McLean relayed to the Wilmington police. As they were waiting for the Wilmington police to call back, defendant told McLean that he had been in Wilmington at the Park View Grill and that three women who were there had become engaged in an argument about homosexuality. Further, he said, to avoid the argument, defendant and the victim had left the bar to go eat. Defendant stated that, while en route to the restaurant, he and the victim had continued the argument and that he had pulled into a parking lot off Shipyard Boulevard. Defendant told McLean that he began to beat the victim with his hand and that when he saw blood, he became more enraged and continued to beat her. He said he then took the victim from his truck, pulled her into the woods, and left the scene.

At approximately 2:00 p.m. the same day, pursuant to the directions relayed by McLean and the defendant to the Wilmington police, searchers discovered the victim's body in an area consistent with the location given. Dennis Pridgen, a detective with the Wilmington Police Department, found the body of the victim. Pridgen described the area as a trailer drop with adjacent woods. The area was heavily wooded, with a lot of trees, briars, and thick bushes. As Pridgen approached the body of the victim, he noted that she was lying face down; her back side was covered with blood and leaves; and she was very, very pale. Within a few feet of the body, there were two places where there were indentations in the leaves and blood spots. One spot was approximately four feet from the body, and the other, two feet. Pridgen noted that there appeared to be some type of internal organ hanging out of her body and over her right thigh. Once the body was turned over, Pridgen noted that the victim had her hands curled up, gripping pine straw and leaves.

At approximately 4:20 p.m. on 22 February 1990, Detective Jerry Lamm of the Harnett County Sheriff's Department spoke to defendant at length in the law enforcement center in Lillington. Before conducting the interview, Lamm advised defendant of his constitutional rights, and defendant replied that he understood his rights. Defendant then signed a rights waiver form. Defendant related the events of 21 February and 22 February basically as follows: Defendant stated that he went to the bar, drank beer, and shot pool with three women, including Wanda, the owner. Defendant claimed that he and the three women were all drunk and that he consumed about ten beers in an hour's time. He also said that he could tell that the three women were lesbians by the way they were acting. At about 2:00 a.m., he asked if there was some place they could go eat, and Whitley informed him that there was a place just around the corner. Whitley and one of the women said they would meet defendant and the victim at the restaurant. The victim said she was going to ride with defendant because she wanted to ride in a big truck. The victim got into the sleeper portion of the truck because defendant had a television and tools in the passenger seat and floor. While trying to find the restaurant, defendant and the victim got into an argument. They started to discuss why the victim and the other women were lesbians. Defendant then pulled into a parking lot in a warehouse to relieve himself. He got out, went to the bathroom beside the

truck, and then got back inside. The victim was still in the sleeper. Defendant and the victim again started talking about her being a lesbian, and he asked, "didn't a man satisfy her and [he] reached over and touched her breast." The victim "backhanded" defendant. Defendant then "backhanded" the victim, and she fell back in the sleeper. When defendant went after the victim, she said, "You're going to rape me, I have been raped before," and she started taking her clothes off. Before she did this, defendant stated that he "lost it" and "hit her a few more times in the head." The victim was bleeding from the mouth and side of the head. After the victim took her clothes off, defendant "started kissing her and biting her, biting on her [breasts]." The victim was fighting, kicking, and screaming, and defendant knew he was getting too rough because the victim's breasts were bleeding. Defendant started playing with the victim's vagina and put four fingers inside of her. Defendant said to her, "My little [penis] ain't going to do anything for you," so he got some cream (waterless hand cleaner) from the floorboard and put it on his hands. He then stuck his hand "up her vagina past [his] wrist in and out a couple of times." When defendant put his hand in a second time, he felt it getting sticky and pulled it out. He turned on the light in his truck and saw blood on his hand, on the victim, and on the bed. Defendant jumped back to the front seat. He then heard the victim say that she needed to urinate. He put the truck in gear and pulled around to some trees. The victim started crawling out, and defendant got out to help her. By the time defendant got around to the passenger door, the door was open, and the victim fell to the ground. Defendant grabbed the victim by her arms and dragged her into the woods on her back and left her lying on her back. The victim was still conscious because she said, "Leave me alone, let me die." Defendant left her lying in the woods and drove to Hoggard High School, where he was to make his first morning delivery.

Upon arriving at the school at approximately 4:30 a.m., defendant cleaned up the truck and wiped up the blood with a towel. He then got into the sleeper and went to sleep. At approximately 8:15 a.m., he was awakened and told that he could unload in an hour. While defendant was at the school, a woman called and asked him if he was the truck driver from Alabama who had been at the bar the previous night and was driving a white truck. Defendant told the woman that he was not. After unloading, defendant got in his truck and headed for New Jersey. Upon arriving in Dunn,

North Carolina, defendant stopped at Robinhood Truck Stop on Interstate 95, where he telephoned a minister. The minister and Deputy McLean met defendant at the truck stop, and eventually McLean took defendant to Lillington.

During defendant's statement to Detective Lamm, he further related that he and his wife had separated in September 1989. He had been having financial problems, and he had just started work three weeks prior to the assault and murder.

An autopsy of the victim's body revealed multiple bruises and lacerations to the victim's jaw, eyes, right cheek, lip, right hand, left upper arm, and breasts. The peritoneal wall between the victim's vagina and rectum was torn, revealing an opening of approximately four to five inches in diameter. Approximately twenty inches of the victim's small intestine was hanging from between the victim's legs. The victim's right kidney, instead of resting in what is known as the kidney bed, had been pulled and torn, brought forward, and the blood vessels supplying it had been partially torn. The pathologist who performed the autopsy opined that the tearing between the vaginal and anal openings occurred either by the use of fingers or hands grasping tissue and tearing downward, causing a hole through the top of the vagina into the rectum, and ultimately tearing out the rectovaginal septum, or by putting part of the hand or fingers into the rectum and some fingers in the vagina and tearing it out, going upward from the outside in. The pathologist also testified that it would not have been possible for a hand to reach inside the victim and grab, at one time, the right kidney and the portion of the colon that was torn loose. Based upon the examination and the autopsy, the pathologist testified that the victim bled to death from the lacerated blood vessels leading to the kidney and to the colon. It was also determined that the victim would have remained conscious for ten to twenty minutes, during which time she would have experienced considerable pain.

Defendant presented no evidence at the guilt phase.

[1] By his first assignment of error, defendant contends that to be punished for both first-degree sexual offense and first-degree murder violates the double jeopardy clause prohibition against multiple punishments for the same offense. Defendant argues that a first-degree sexual offense conviction based solely upon the theory that the victim was seriously injured merges with the first-degree murder offense, where the serious injury committed during the

sexual offense results in the victim's death. The scope of appellate review is limited to those issues presented by assignment of error set out in the record on appeal. N.C. R. App. P. 10(a); *Koufman v. Koufman*, 330 N.C. 93, 97-98, 408 S.E.2d 729, 731 (1991). No assignment of error corresponds to the issue presented, and therefore, this matter is not properly presented for our consideration.

**[2]** Defendant next assigns as error the failure of the trial judge to dismiss the charge of first-degree sexual offense because the State failed to present substantial evidence of "serious personal injury" as that phrase is used in the definition of first-degree sexual offense under N.C.G.S. § 14-27.4. It is defendant's position that because there was no "serious personal injury" to the victim other than the fatal one, his conviction for first-degree sexual offense cannot stand, and his conviction must be either set aside or reduced to second-degree sexual offense. We do not agree.

The pertinent portion of the sexual offense statute is as follows:

**§ 14-27.4. First-degree sexual offense.**

(a) A person is guilty of a sexual offense in the first degree if the person engages in a sexual act:

. . . .

(2) With another person by force and against the will of the other person, and:

. . . .

b. Inflicts serious personal injury upon the victim or another person[.]

N.C.G.S. § 14-27.4 (1986).

In determining whether serious personal injury has been inflicted, the court must consider the particular facts of each case. *State v. Herring*, 322 N.C. 733, 739, 370 S.E.2d 363, 367 (1988). The element of infliction of serious personal injury is satisfied

when there is a series of incidents forming one continuous transaction between the rape or sexual offense and the infliction of the serious personal injury. Such incidents include injury inflicted on the victim to overcome resistance or to obtain submission, injury inflicted upon the victim or another in an attempt to commit the crimes or in furtherance of the crimes of rape or sexual offense, or injury inflicted upon the victim

or another for the purpose of concealing the crimes or to aid in the assailant's escape.

*State v. Blackstock*, 314 N.C. 232, 242, 333 S.E.2d 245, 252 (1985). The injury must fall short of causing death. *State v. Boone*, 307 N.C. 198, 203, 297 S.E.2d 585, 588 (1982).

In the case *sub judice*, Dr. Charles Garrett, the regional pathologist, performed the autopsy on the victim and testified on behalf of the State. Dr. Garrett first performed an external examination of the body, noting any injuries or damage to the exterior. He noted, in part, a large area of reddish purple bruising along the jaw line and a linear one-half inch abrasion or scraping of the skin on the right side of the victim's face and jaw. There was a three-quarter inch laceration or tearing on the outer portion of the right eyelid and a one-half inch laceration or tearing above the eyebrow on the forehead. The victim's right upper lip had two, three-eighths-inch lacerations all the way through the lip. On the left occipital scalp, there was a one and a half inch bursting type laceration. On the back of the right hand, there was a five-by three-inch reddish purple bruise with blood under the skin. There were bruises on the outside portion of the left breast, and in a linear line, there was a scrape below the breast, with multiple small lacerations or tears; this covered an area of five by two and a half inches. There were deep lacerations or tears into the nipple. Dr. Garrett, as a result of both the external and internal autopsy, concluded that the cause of death was loss of blood from the lacerated blood vessels in the area of the victim's pelvis, kidney, and colon caused by the internal injuries.

Heidi Crossley testified that she was unable to recognize the victim when asked to identify the body because she had been so badly beaten. She eventually identified the victim solely because of a uniquely shaped mole on her face.

In addition, the statement given by defendant to Detective Lamm supports the conclusion that the victim suffered serious injury. Defendant stated that not only did he hit the victim in the head to the point that she was bleeding from the mouth and the side of the head, but he bit her breasts until they were bleeding. At this point, defendant stated that the victim told him that she knew that she was going to be raped and then began to disrobe. After defendant put his hand in the victim's vagina "a couple of

times," the victim tried to crawl out of the truck, and defendant then dragged her 120 feet into the woods.

When the evidence in this case is viewed in the light most favorable to the State, it clearly shows a savage beating that can only be characterized as being substantial evidence of "serious personal injury." *See generally State v. Herring*, 322 N.C. at 739, 370 S.E.2d at 367. None of the serious external injuries, as testified to by the pathologist and Crossley, were the cause of the victim's death. All of the external injuries were inflicted upon the victim immediately prior to and during the sexual assault by the defendant. This conclusion is consistent with defendant's own statement. The trial court thus properly denied defendant's motion to dismiss the charge of first-degree sexual offense.

[3] Defendant next contends that the first-degree murder charge should have been dismissed because the evidence was insufficient to permit the jury reasonably to infer that defendant intended to kill the victim after premeditation and deliberation. Defendant argues that all of the evidence showed that defendant was in a state of sudden passion when he injured the victim, that he sexually assaulted her when he became enraged and sexually aroused by the victim. We find that the evidence, when viewed in the light most favorable to the State, was sufficient to support a jury's finding that the defendant killed the victim with premeditation and deliberation.

Premeditation and deliberation are usually proved by circumstantial evidence because they are mental processes that are not readily susceptible to proof by direct evidence. *State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992). Some of the circumstances from which an inference of premeditation and deliberation can be drawn are:

(1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*Id.* Six of the seven above circumstances were met in the case at bar. As a result, there was more than sufficient evidence that the killing was premeditated and deliberated.

According to defendant's own statement, he began his sexual assault of Ms. Kreeger by reaching over and touching the victim's breast. The victim, who was five feet two inches and weighed 140 pounds, responded to this unsolicited and unconsented-to fondling by slapping the six-foot one-inch, 265-pound defendant. Defendant then knocked the victim back into the sleeper and hit her a few more times on the head. There is no evidence of provocation by the victim in this case. Merely repelling a sexual assault does not constitute provocation. *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983).

Furthermore, evidence of defendant's conduct and statements before and after the killing may be considered in determining whether premeditation and deliberation existed. Before the defendant assaulted the victim, he knocked her back into the sleeper. Defendant then hit the victim on the head numerous times, bit her breasts until they were bleeding, and then proceeded to insert his fingers into her vagina. The entire time the assault was occurring, the victim was fighting, kicking, and screaming. After putting his fingers into the victim's vagina, defendant took the time to reach for the waterless hand cleaner on the front seat floorboard, lubricated his hands with it, and then penetrated the victim again with his entire hand to a point past his wrist "a couple of times." Upon tearing out part of the victim's large intestine, defendant drove the truck around closer to the woods. When the victim began to crawl out of the truck, defendant went around to the passenger door. The victim fell to the ground, and defendant dragged her into the woods, approximately 120 feet, on her back. Defendant knew that the victim was still conscious because she begged him to "[l]eave me alone, let me die."

Defendant also dealt lethal blows to the victim after she was rendered helpless. Defendant admitted in his statement that he beat the victim about the head and face and bit her breasts until they bled, all while the victim was conscious. After the victim succumbed to defendant's beating, she removed her clothes, and he then began penetrating the victim with his fingers. Because the victim was in the sleeper portion of the truck, which was

approximately three feet by six feet by five feet, she was basically imprisoned and unable to escape the defendant's brutal assault. After applying hand cleaner to his hands, defendant then inserted his hand approximately ten inches into the victim's vagina and into the peritoneal cavity which holds the intestines. Defendant then tore out the rectovaginal septum, the wall between the vaginal and the anal openings. He proceeded to tear out part of the victim's colon and her right kidney. The pathologist testified that the victim would have remained conscious for ten to twenty minutes and that up until the time she lost consciousness, the victim would have been able to feel and experience pain. In fact, defendant dragged the victim on her back 120 feet into the woods, and the detectives found the victim lying on her stomach, grasping leaves and pine straw. The victim was obviously conscious for some amount of time after being left to die. There is no question in this case that the killing was done in a vicious manner.

In addition, the nature and number of the victim's wounds clearly provide substantial evidence that the killer premeditated and deliberated. In *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), this Court found that there was sufficient evidence from which the jury could properly have inferred premeditation and deliberation, where a pathologist testified that the killing was accomplished by a person stabbing the victim through the neck, partially removing the knife, and then plunging it home again. In the case at bar, defendant inserted his hand past his wrist into the victim's vagina a "couple of times." He not only tore her kidney out of the kidney bed, but also pulled twenty inches of her colon out of her body. As the pathologist stated, this could only be accomplished through multiple penetrations.

Following the incident, defendant left the victim to die without attempting to obtain assistance for her. In fact, defendant went to a convenience store and asked for directions so that he could find Hoggard High School. Once at Hoggard, he cleaned up the truck and then went to sleep for approximately four hours. While at Hoggard High School, defendant talked with Wanda Whitley and denied ever having been at Park View Grill. After the truck was unloaded, defendant left Wilmington and began driving to New Jersey. Defendant's actions in disposing of the body and cleaning up his truck indicate his careful thought and planning to hide the killing. Actions taken to hide or cover the commission of a murder

can be considered as evidence of premeditation and deliberation. *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987). This evidence is another circumstance from which premeditation and deliberation can be inferred.

The overwhelming weight of the evidence supports the conclusion that the trial court did not err in denying defendant's motion to dismiss the murder charge to the extent it was based on the theory of premeditation and deliberation.

[4] In defendant's fourth argument, he contends that the trial court erred in refusing to instruct the jury on second-degree murder. Defendant argues that his statements show that he was provoked, not in the sense of reducing his crime to manslaughter, but sufficient to negate premeditation and deliberation. Defendant contends that although he had a general intent to hurt the victim, he had no specific intent to kill her.

The State contends that there was no evidence showing a lack of premeditation, deliberation, and intent to kill, and therefore, the trial court was not required to submit a second-degree murder verdict. We agree. Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation. *State v. Phipps*, 331 N.C. 427, 457-58, 418 S.E.2d 178, 194 (1992). Although second-degree murder is a lesser included offense of first-degree, premeditated and deliberated murder, the trial court does not have to charge the jury on second-degree murder unless it is supported by the evidence. *State v. Stevenson*, 327 N.C. 259, 263, 393 S.E.2d 527, 529 (1990). In *State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986), this Court set out the procedure to follow in determining whether the evidence of defendant's premeditation and deliberation was such as to require an instruction on second-degree murder.

> We emphasize again that although it is for the jury to determine, from the evidence, whether a killing was done with premeditation and deliberation, the mere possibility of a negative finding does not, in every case, assume that defendant could be guilty of a lesser offense. Where the evidence belies anything other than a premeditated and deliberate killing, a jury's failure to find all the elements to support a verdict of guilty of first degree murder must inevitably lead to the conclusion that the jury disbelieved the State's evidence and that defendant

is not guilty. The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*Strickland*, 307 N.C. at 293, 298 S.E.2d at 657-58. An instruction on the lesser offense of second-degree murder is not required where there is not a scintilla of evidence to support the lesser verdicts. *Id.* at 286, 298 S.E.2d at 653.

In the case *sub judice*, the State's evidence supports only a first-degree murder instruction. First-degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. N.C.G.S. § 14-17 (1989); *State v. Brown*, 315 N.C. 40, 58, 337 S.E.2d 808, 822 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation; it is sufficient if the process of premeditation occurred at any point prior to the killing. *Brown*, 315 N.C. at 58, 337 S.E.2d at 822. Deliberation means an intent to kill carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose, and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *Id.* A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation, and therefore, proof of premeditation and deliberation is also proof of intent to kill. *State v. Lowery*, 309 N.C. 763, 768, 309 S.E.2d 232, 237 (1983).

An unlawful killing is deliberated and premeditated if done as part of a fixed design to kill, notwithstanding the fact that the defendant was angry or emotional at the time, unless such anger or emotion was strong enough to disturb the defendant's ability to reason. *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 338 (1986). The requirement of a "cool state of blood" does not require that the defendant be calm or tranquil. *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980). The phrase "cool state of

blood" means that the defendant's anger or emotion must not have been such as to overcome the defendant's reason. *State v. Brown*, 315 N.C. at 58, 337 S.E.2d at 822.

As previously stated, while in the defendant's truck, defendant grabbed the victim's breast, at which time the victim "backhanded" the defendant. By his own admission, defendant stated that he began beating the victim about the head and face. As defendant told Deputy McLean, when he saw the victim's blood, he became more enraged and continued to beat her. Fearing that she was going to be raped, the victim removed her clothing. At this point, defendant states:

> After she took her clothes off, I started kissing her and biting her, biting on her [breasts]. She didn't do anything. She was moaning, so I knew she was conscious. She was fighting, kicking and screaming. I was getting rougher, biting her [breasts]. I knew I was too rough because they were bleeding. I was lying beside her. I was playing with her vagina. I put four fingers inside her. I said, "My little [penis] ain't going to do anything for you," so I got some cream from the floorboard and creamed by [sic] hand. I stuck my hand up her vagina past my wrist in and out a couple of times. She grunted and I thought she was getting into it. When I put my hand in a second time and went back and forth, I felt it getting sticky, so I pulled my hand out and saw blood on it. I turned the light on and saw blood on her and on the bed.

The sequence of events outlined above, in addition to the circumstances necessary to infer premeditation and deliberation as set out in our discussion of defendant's third assignment of error above, clearly show that the State has met its burden of proving each and every element of first-degree premeditated and deliberated murder. The statement by defendant raises no question as to premeditation and deliberation. Defendant has presented no evidence to negate any of these elements. It is clear that defendant's intent to kill the victim could have developed at any time prior to the beating, during the beating, or after the beating. Even assuming that defendant had not formed an intent to kill at the time the assault began, no rational juror could have reasonably found that defendant, having beaten the victim into submission and having inserted his hand past his wrist into the victim's vagina at least twice, pulling out the victim's organs, did not act with premedita-

tion and deliberation when he later dragged her 120 feet into the woods, leaving her helpless and bleeding to death. We conclude that the evidence showing that the offense was committed over such a long period of time, with so many conscious decisions by the defendant, clearly supports the trial court's finding that the defendant possessed the requisite premeditation and deliberation.

[5] Defendant further relies on the fact that the jury found that he was under the influence of a mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. Although the jury found these mitigating circumstances, no evidence exists that the defendant's emotions overcame his reason. After the brutal beating and sexual assault, defendant dragged the victim 120 feet into the woods to avoid her discovery. In defendant's own statement, he admits that the victim was conscious while he was dragging her deep into the woods, and in fact, the victim was begging the defendant to leave her alone and let her die. Defendant then cleaned up his truck, resumed his delivery route, and slept before his next delivery.

The State established all of the elements of first-degree murder, including premeditation and deliberation, and defendant did not produce any evidence sufficient to negate these elements. The trial judge properly excluded from jury consideration the possibility of second-degree murder because the evidence presented at trial did not raise a genuine issue as to whether the defendant acted with premeditation and deliberation in the killing.

[6] We find defendant's fifth assignment of error, that the trial court erred in instructing the jury that it could infer premeditation and deliberation from lack of provocation by the victim, to be without merit.

In the case *sub judice*, the trial judge instructed the jury that it could infer the first-degree murder elements of premeditation and deliberation from the following circumstances:

Neither premeditation nor deliberation is usually susceptible of direct proof. They may be proved by proof of circumstances from which they may be inferred, such as the *lack of provocation* by the victim or conduct of the defendant before, during and after the killing, or by the use of grossly excessive force or brutal or vicious circumstances of the killing,

**STATE v. THOMAS**

[332 N.C. 544 (1992)]

> or by the manner in which or means by which the killing
> was done.

(Emphasis added.) Defendant argues that this instruction was er-
roneous because (1) the instruction implied a judicial opinion on
the evidence, (2) the instruction placed the burden on defendant
to show a lack of provocation, (3) the instruction allowed the jury
to find premeditation and deliberation on a theory not supported
by the evidence, and (4) the instruction relieved the State of its
constitutional burden of proving every element of the crime beyond
a reasonable doubt. Because defendant did not object to the trial
court's instructions at trial, we review the defendant's assignment
of error only for plain error. Under the plain error rule, defendant
must convince this Court not only that there was error, but that
absent the error, the jury probably would have reached a different
verdict. *State v. Faison*, 330 N.C. 347, 361, 411 S.E.2d 143, 151
(1991). This exact assignment of error has recently been reviewed
and rejected by this Court in a case where a virtually identical
instruction was given over defendant's objection. *State v. Handy*,
331 N.C. 515, 419 S.E.2d 545 (1992). In *Handy*, this Court, after
concluding that the evidence of provocation was not contradicted,
found that the "lack of provocation" instruction was not erroneous.

The examples listed in the above instruction, which is taken
directly from the North Carolina Pattern Jury Instructions,
N.C.P.I.—Crim. 206.13 (1989), "are merely examples of circumstances
which, if found, the jury could use to infer premeditation and delibera-
tion. It is not required that each of the listed elements be proven
beyond a reasonable doubt before the jury may infer premeditation
and deliberation." *State v. Cummings*, 326 N.C. 298, 315, 389 S.E.2d
66, 76 (1990). However, when the trial judge focuses his instruction
upon one or more of such elements as circumstantial proof of
premeditation and deliberation, those focused upon must be sup-
ported by competent evidence. *State v. McDowell*, 329 N.C. 363,
388, 407 S.E.2d 200, 214 (1991).

In this case, the challenged portion of the instruction was
clearly justified because all of the evidence at trial, including de-
fendant's own statement, revealed no provocation on behalf of the
victim. In his statement, defendant admits that he began his assault
of the victim by an unsolicited and unconsented-to fondling of her
breasts. The victim responded by slapping the defendant. Defend-
ant then proceeded to beat the victim into submission and sexually

abused her to the point that she died. The victim's act of slapping the defendant did not constitute provocation, as the act of repelling a sexual assault does not constitute provocation under North Carolina law. *See State v. Williams*, 308 N.C. 47, 301 S.E.2d 335 (throwing of salt at an intruder did not constitute provocation on the part of the deceased); *State v. Hunter*, 305 N.C. 106, 115, 286 S.E.2d 535, 540 (1982) (defendant entitled to use reasonable force to protect himself from possibility of sexual assault).

We conclude that there was competent evidence to support the instruction. Thus, we find no error and, consequently, no plain error.

[7] As his final argument, defendant contends that the felony murder statute in North Carolina offends both the state and federal constitutions because it relieves the State of proving any criminal state of mind. It is well established that proof of the elements of premeditation, deliberation, and specific intent to kill is not necessary to sustain a first-degree murder conviction based on the theory that the homicide was committed during the perpetration or attempted perpetration of a felony. *State v. Evangelista*, 319 N.C. 152, 157, 353 S.E.2d 375, 380 (1987). The felony murder rule, as set out in N.C.G.S. § 14-17, does not establish a presumption of premeditation and deliberation in violation of due process and equal protection because premeditation and deliberation are not elements of felony murder, and thus the statute involves no presumption of such. *State v. Wall*, 304 N.C. 609, 613, 286 S.E.2d 68, 71 (1982). Under the felony murder rule, a homicide that is committed in the perpetration of one of the statutorily specified felonies is first-degree murder. A homicide committed in the perpetration or attempted perpetration of a sexual offense is murder in the first degree, as set out in N.C.G.S. § 14-17, and because premeditation and deliberation are not elements of felony murder, the State is not relieved from proving criminal *mens rea*.

For the reasons stated above, we find that defendant received a fair trial, free of prejudicial error.

NO ERROR.