STATE OF NORTH CAROLINA v. EARL RICHMOND, JR.

No. 347A95

(Filed 6 February 1998)

**1. Jury § 142 (NCI4th)— jury selection—question concerning prior murder—uncontroverted facts—impermissible stake-out**

The trial court did not err in a capital prosecution for three counts of first-degree murder and one count of first-degree rape by refusing to allow defendant to ask prospective jurors whether they would be able to consider mitigating circumstances and impose a life sentence after being informed that defendant had been previously convicted of first-degree murder. An almost identical question was presented in *State v. Robinson*, 339 N.C. 263, where it was held to be an improper attempt to stake-out the jurors. It is not permissible to ask a prospective juror how a certain set of facts would affect his or her decision and a stake out question is not made permissible simply because it is predicated on a set of facts that is cast as uncontroverted rather than hypothetical. Language in *State v. Bond*, 345 N.C. 1, should not be construed to allow any or all voir dire questions premised on uncontroverted facts, regardless of their tendency to stake out or indoctrinate jurors. Furthermore, *Morgan v. Illinois*, 504 U.S. 719, does not require that a defendant be allowed to ask stake-out questions. The trial court here properly refused to allow questioning about defendant's prior first-degree murder conviction, while allowing defendant to ask prospective jurors whether they would be able to consider all aggravating and mitigating circumstances.

**2. Jury § 227 (NCI4th)— jury selection—death penalty—equivocal answers**

The trial court did not abuse its discretion by excusing for cause a prospective juror in a capital prosecution for first-degree murder and first-degree rape where the juror was equivocal at times about her ability to impose the death penalty but on several occasions clearly stated her inability to fairly consider the death penalty as punishment.

**3. Jury § 227 (NCI4th)— jury selection—death penalty— equivocal answers**

The trial court did not abuse its discretion by excusing for cause a prospective juror in a capital prosecution for first-degree murder and first-degree rape where the juror was equivocal at times but made several statements which indicated his inability to follow the law. The juror stated that he was opposed to the idea of the death penalty and that he would probably go with life imprisonment.

**4. Jury § 215 (NCI4th)— jury selection—belief in death penalty—consideration of both alternatives**

The trial court did not abuse its discretion during jury selection for a capital prosecution for first-degree murder and first-degree rape by denying defendant's challenge for cause of a prospective juror where the juror indicated that she would be inclined to vote for the death penalty, the court explained the process of weighing mitigating and aggravating circumstances, and the juror stated three times that she could fairly consider both sentencing alternatives.

**5. Evidence and Witnesses § 221 (NCI4th)— capital murder—evidence that defendant attended victims' funeral— relevant**

The trial court did not err in a capital prosecution for three counts of first-degree murder and one count of first-degree rape by admitting evidence that defendant had attended the funeral of the three victims and had served as a pallbearer for one of the child victims, including defendant's statement that carrying the body of a victim he had killed "never gave [him] a bad feeling." Evidence of defendant's participation and demeanor at the funeral tended to shed light on the circumstances of the murders and defendant's intent at the time of the offenses, so that the evidence was relevant under N.C.G.S. § 8C-1, Rule 401, and the trial court was within its discretion in ruling that its probative value was not substantially outweighed by unfair prejudice. N.C.G.S. § 8C-1, Rule 403.

**6. Rape and Allied Sexual Offenses § 96 (NCI4th)— first-degree rape—seriousness of injury—deceased victim**

The evidence was sufficient to support a conviction for first-degree rape where defendant contended that there was insufficient evidence that he had inflicted serious personal injury in that

STATE v. RICHMOND

[347 N.C. 412 (1998)]

serious personal injury does not include injury that results in death. The rule that serious personal injury cannot include injury causing death appears to have its genesis in *State v. Jones*, 258 N.C. 89 (1962), which held that the statute under which a charge of assault with a deadly weapon with intent to kill inflicting serious injury was brought included as an element that the assault inflicts serious injury not resulting in death. It was logical for the General Assembly to limit the injuries capable of supporting assault charges because injury causing death would have elevated the assault to murder, but it would be absurd to allow a defendant to escape a first-degree rape conviction because his victim did not survive the injuries inflicted in the course of the sexual assault. Any language in *State v. Boone*, 307 N.C. 198 and *State v. Thomas*, 332 N.C. 544 suggesting that the serious personal injury element of first-degree rape or sexual offense cannot be injury causing death is disavowed. There was sufficient evidence in this case to support the element of serious personal injury.

**7. Homicide § 349 (NCI4th)— first-degree murder—refusal to submit second-degree—no error**

The trial court did not err in a capital prosecution for the first-degree murder of a mother and two children and the first-degree rape of the mother by refusing to submit second-degree murder to the jury in connection with the murder of the two children. The evidence showed that after defendant killed the adult victim, he awakened one child, took him into the bathroom, wrapped a cord around his neck five times, and stabbed him at least twenty times in the head and body with a pair of scissors; defendant then went into the other child's room, awakened her, sat her on the edge of the bed, and strangled her with the cord of a curling iron. This evidence shows that defendant acted with deliberation and does not show anger or emotion that overcame his reason so as to reduce the killing to second-degree murder; a rational trier of fact could not have convicted defendant of second-degree murder under this evidence.

**8. Criminal Law § 786 (NCI4th Rev.)— capital murder—intoxication—instruction refused—insufficient evidence of intoxication at time of crime**

The trial court did not err in a capital prosecution for the first-degree murders of a mother and two children by refusing to

instruct the jury on voluntary intoxication where defendant argued that the evidence showed that he had consumed crack and alcohol on the night of the murders, but the evidence at best showed that he was intoxicated at some time prior to the murders. There is little evidence of the degree of his intoxication at the time of the murders. There is evidence that defendant methodically killed everyone in the house, leading one victim into the bathroom and sitting another on the edge of the bed, and that he tried to hide his crimes, which is indicative of a capacity for premeditation and deliberation. Defendant has not made the necessary showing that he was utterly incapable of forming the requisite intent.

9. **Criminal Law § 431 (NCI4th Rev.)— capital murder—prosecutor's argument—intoxication—evidence only from defendant's relatives—not a comment on defendant's failure to testify**

The trial court did not abuse his discretion by not intervening *ex mero motu* in response to a statement made by the prosecutor during closing arguments in a capital prosecution for the first-degree murder of a mother and two children and the first-degree rape of the mother where defendant contended that the prosecutor improperly commented on defendant's failure to testify when discussing the evidence of his intoxication on the night of the murders, but the prosecutor's statement was that defendant never told anyone he had been drinking or taking drugs that night and that out of 35 or 40 people at the party, the only two that the jury heard were his own relatives. These statements properly suggested potential bias in defendant's sisters' testimony concerning the degree of his intoxication.

10. **Criminal Law § 472 (NCI4th Rev.)— first-degree rape—prosecutor's argument—serious personal injury—deceased victim—correct statement of law**

The trial court did not abuse its discretion by not intervening *ex mero motu* in the prosecutor's closing argument in a capital prosecution for three first-degree murders and a first-degree rape where defendant contended that the prosecutor misstated the law concerning the serious personal injury element of first-degree rape, but, as clarified above, the prosecutor's statement of law was correct.

**11. Criminal Law § 467 (NCI4th Rev.)— capital murder— prosecutor's argument—premeditation and deliberation— choking**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by not intervening *ex mero motu* when the prosecutor argued that the act of choking someone establishes premeditation and deliberation. The jury may infer premeditation and deliberation from the circumstances of a killing, including the fact that the death was by strangulation, and the prosecutor's statement was not a misstatement of the law or of the facts.

**12. Criminal Law § 470 (NCI4th Rev.)— capital murder—prosecutor's argument—killing to eliminate witness—sleeping victim—argument supported by evidence**

The trial court did not abuse its discretion in a capital prosecution for three first-degree murders and a first-degree rape by not intervening *ex mero motu* where the prosecutor argued that one of the killings was to eliminate a possible witness. Although defendant argues that the statement was not supported by the evidence because this victim was asleep while her mother and brother were being murdered, the child certainly would have been a possible witness to the events before and after, if not during, the murders.

**13. Homicide § 419 (NCI4th)— first-degree murders—instructions—depraved heart malice—no error**

The trial court did not err in its charge on two first-degree murders based on malice, premeditation, and deliberation by including in its malice instruction wanton acts manifesting depravity of mind, a heart devoid of a sense of social duty, and a callous disregard for human life. Although defendant contended that the type of unintentional conduct associated with wanton or depraved heart malice is inconsistent with a specific intent to kill, depraved heart malice can support a first-degree murder conviction provided the State proves premeditation and deliberation. The trial court here properly instructed the jury and there was sufficient evidence of malice, premeditation, and deliberation to support defendant's three first-degree murder convictions based on this theory.

STATE v. RICHMOND

[347 N.C. 412 (1998)]

**14. Criminal Law § 1338 (NCI4th Rev.)— capital sentencing—prior murder—testimony of victim's father—admissible**

The trial court did not err in a capital sentencing proceeding by admitting the testimony of the father of a prior murder victim in which he identified photographs of his daughter at the crime scene and the autopsy and testified about the cause of her death. Assuming this hearsay testimony not to be within a recognized exception, the Supreme Court was satisfied that the father's testimony concerning how she was murdered, the injuries she sustained, and the identification of postmortem photographs were sufficiently reliable to satisfy the requirements of the Confrontation Clause. Moreover, any error was harmless beyond a reasonable doubt because a certified copy of defendant's criminal judgment for this offense was admitted. This evidence adequately supported the trial court's submission of the aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of violence to the person.

**15. Criminal Law § 1338 (NCI4th Rev.)— capital sentencing—prior murder—victim survived by small children—admissible**

The trial court did not err in a capital sentencing proceeding by admitting testimony from the father of a prior murder victim that his daughter was survived by two small children. As in *State v. Reeves*, 337 N.C. 700, the evidence is relevant for the jury's deliberations.

**16. Criminal Law § 1385 (NCI4th Rev.)— capital sentencing—mitigating circumstance—alcohol and cocaine abuse—subsumed by other circumstances**

The proposed capital mitigating circumstances that defendant had long-standing alcohol and cocaine abuse problems and that the use of alcohol and drugs tended to make him act violently were subsumed by other submitted circumstances.

**17. Criminal Law § 1392 (NCI4th Rev.)— capital sentencing—proposed mitigating circumstance—no proper treatment for psychological problems—subsumed by submitted circumstances**

Although it was not clear in a capital sentencing proceeding that the proposed mitigating circumstance that defendant was never given proper treatment for his psychological problems had mitigating value because there was no evidence that defend-

STATE v. RICHMOND

[347 N.C. 412 (1998)]

ant had ever sought or requested such treatment, that circumstance was subsumed by nonstatutory circumstances that were submitted.

**18. Criminal Law § 1392 (NCI4th Rev.)— capital sentencing— proposed mitigating circumstances—positive influence on other inmates—subsumed by submitted circumstances**

The proposed capital mitigating circumstance that defendant had a positive influence on other inmates was subsumed by the submitted nonstatutory circumstances that defendant exhibited good conduct in jail following his arrest and that defendant helped other inmates develop their religious faiths.

**19. Criminal Law § 1392 (NCI4th Rev.)— capital sentencing— proposed mitigating circumstance—seeking divine forgiveness—subsumed by submitted circumstances**

The proposed capital mitigating circumstance that defendant has sought forgiveness from God was subsumed in the circumstances that defendant has sought forgiveness since his arrest. This circumstance, with the catchall circumstance, provided an adequate vehicle for the jury to consider the mitigating value of the evidence.

**20. Criminal Law § 692 (NCI4th Rev.)— capital sentencing— mitigating circumstance—mental or emotional disturbance—peremptory instruction denied**

The trial court did not err in a capital sentencing hearing by refusing to peremptorily instruct the jury on the mitigating circumstance that defendant was under the influence of a mental or emotional disturbance at the time of the murders. Whether defendant was under the influence of such a disturbance was controverted by the State's evidence that the existence of any psychological problems in defendant did not necessarily mean that these problems influenced defendant at the time of the crime and that defendant's behavior at the time of the crime was goal-directed, which indicates that he was not influenced by a mental or emotional disturbance.

**21. Criminal Law § 690 (NCI4th Rev.)— capital sentencing— mitigating circumstances—severe personality disorder— peremptory instruction denied**

The trial court did not err in a capital sentencing proceeding by not giving a peremptory instruction on the circumstance that

defendant had a severe personality disorder where all of the evidence came from mental health professionals who conducted their evaluations in preparation for this criminal trial. As a result, this evidence lacks sufficient indicia of reliability to permit the conclusion that it is manifestly credible.

**22. Criminal Law § 690 (NCI4th Rev.)— capital sentencing—mitigating circumstances—defendant's childhood—peremptory instruction denied**

The trial court did not err in a capital sentencing hearing by not giving peremptory instructions on the mitigating circumstances concerning defendant's childhood where these circumstances were based largely on the testimony of defendant's sister. The evidence is not manifestly credible because it is common for a defendant's family members to be biased in his favor.

**23. Criminal Law § 690 (NCI4th Rev.)— capital sentencing—mitigating circumstances—confession—peremptory instruction denied**

The trial court did not err in a capital sentencing proceeding by not giving a peremptory instruction on the mitigating circumstances that defendant confessed to law enforcement officers and that he cooperated with law enforcement officers upon his arrest, submitting to multiple interviews over several days, where the evidence showed that defendant initially lied to the officers, maintaining his innocence even in the face of DNA evidence that he was the donor of sperm found in the adult victim.

**24. Criminal Law § 690 (NCI4th Rev.)— capital sentencing—adjustment to prison life—peremptory instruction denied**

The trial court did not err in a capital sentencing hearing by not giving a peremptory instruction that defendant would adjust well to prison life where the evidence indicated that defendant freely acknowledged his future dangerousness.

**25. Criminal Law § 690 (NCI4th Rev.)— capital sentencing—expression of remorse—peremptory instruction denied**

The trial court did not err in a capital sentencing proceeding by not giving a peremptory instruction that defendant has expressed remorse where there was evidence that, when asked about being a pallbearer for one of the child victims, defendant replied, "It never gave me a bad feeling."

**26. Criminal Law § 690 (NCI4th Rev.)— capital sentencing— good conduct in jail—peremptory instruction denied**

The trial court did not err in a capital sentencing proceeding by not giving a peremptory instruction that defendant has exhibited good conduct in jail where the State presented evidence that defendant was interviewed while in pretrial confinement and fabricated stories about when and why he poured alcohol over the adult victim's genitals.

**27. Criminal Law § 690 (NCI4th Rev.)— capital sentencing— helping other inmates develop religious faith—peremptory instruction denied**

The trial court did not err during a capital sentencing proceeding by not giving a peremptory instruction that defendant has helped other inmates develop their religious faiths where there was evidence that he was involved in prison ministry, but there was no evidence that his efforts had in fact aided in the development of another inmate's faith.

**28. Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's argument—definition of mitigating circumstances—no intervention ex mero motu**

The trial court did not err by not intervening *ex mero motu* in a capital sentencing proceeding during the State's argument where the State repeatedly focused on the idea that mitigation is that which reduces moral culpability while neglecting defendant's age, character, prior record, mentality, education, habits, and environment. Those factors may be relevant considerations, but are not essential to the basic definition of a mitigating circumstance.

**29. Criminal Law § 458 (NCI4th Rev.)— capital sentencing— prosecutor's argument—defendant's alcohol consumption—no intervention ex mero motu**

The trial court did not err by not intervening *ex mero motu* in a capital sentencing hearing when the State argued that the jury should not find defendant's voluntary consumption of alcohol and drugs mitigating. Although defendant contends that the State's argument was tantamount to misstating North Carolina law, the prosecutor's statement did not tell the jury that it could not find this evidence mitigating, but that it should not. The statement was one of advocacy, not of law.

## 30. Criminal Law § 458 (NCI4th Rev.)— capital sentencing—prosecutor's argument—dysfunctional families

The trial court did not err by not intervening *ex mero motu* in a capital sentencing hearing when the State argued that we all grew out of dysfunctional families and have psychological problems and that probably about 35 per cent of the world had alcoholic fathers. While these comments may have been oversimplifications, they were within the wide latitude allowed parties in hotly contested cases.

## 31. Criminal Law § 458 (NCI4th Rev.)— capital sentencing—prosecutor's argument—defendant's recent religious activity—no intervention ex mero motu

The trial court did not err by not intervening *ex mero motu* in a capital sentencing proceeding where the State argued that it was an insult to the jurors' intelligence for defendant to claim that his recent religious activity should be considered mitigating and sarcastically suggested that defendant's service as a pall-bearer at the funeral of one of the victims should be included in the catchall mitigating circumstance.

## 32. Jury § 141 (NCI4th)— capital murder—parole eligibility—jurors' conceptions

The trial court did not err in a capital prosecution for three first-degree murders and a first-degree rape by not permitting *voir dire* of prospective jurors regarding their conceptions of parole eligibility, not allowing defendant to inform the jury as to the law in North Carolina regarding parole eligibility on a life sentence for first-degree murder, and not permitting a psychiatrist to testify concerning defendant's parole eligibility under his federal conviction and its effect on his current mental state and adjustment to incarceration.

## 33. Criminal Law § 1348 (NCI4th Rev.)— capital sentencing—parole eligibility under federal sentence—instruction denied—no error

The trial court did not err in a capital sentencing proceeding by rejecting defendant's request for a jury instruction informing jurors that defendant is ineligible for parole under his federal sentence. The United States Supreme Court in *Simmons v. South Carolina*, 512 U.S. 154, sought to protect against prosecutorial arguments that mislead jurors into believing that if they do not

**STATE v. RICHMOND**

[347 N.C. 412 (1998)]

sentence a defendant to death, he will eventually be released and once again be a threat to society. If a defendant would be sentenced to life in the absence of a death sentence and the State makes such an argument, then *Simmons* requires that the defendant be allowed to inform the jury of the nature of his life without parole sentence. However, if the State refers to future dangerousness only in terms of dangerousness while incarcerated, the concerns of *Simmons* are not implicated. The closing argument here, read as a whole, did not set up a false dilemma like that addressed in *Simmons*.

**34. Criminal Law § 925 (NCI4th Rev.)— capital murder—death sentence recommendation—polling of jury**

There was no error in a capital sentencing proceeding in the manner in which some of the jurors were polled regarding their recommendation of three death sentences where the clerk failed to ask "Do you still assent thereto?" of three jurors as to one murder and of another juror as to two murders. The clerk informed every juror with respect to all three convictions that the jury had recommended that defendant be sentenced to death and then asked every juror, again with respect to each of the three convictions, "Is this your recommendation?" This questioning satisfies the requirements of N.C.G.S. § 15A-2000(b) because it establishes that each individual juror agreed with the sentence recommendation with respect to each conviction.

**35. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A death sentence was not disproportionate where the record fully supports the aggravating circumstances found by the jury; there was no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and this case was distinguishable from the seven cases in which the death penalty was found disproportionate in that this defendant was convicted of three murders, all three of the convictions were based on premeditation and deliberation, defendant was also convicted of the first-degree rape of his adult victim, and there are four statutory aggravating circumstances which, standing alone, have been held sufficient to sustain a sentence of death. This case is more similar to cases in which the death sentence was found proportionate than to those in which it was found disproportionate.

STATE v. RICHMOND

[347 N.C. 412 (1998)]

Justice FRYE dissenting.

Justice WEBB dissenting.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing three sentences of death entered by Johnson (E. Lynn), J., on 1 June 1995 in Superior Court, Cumberland County, upon jury verdicts finding defendant guilty of three counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment was allowed 3 July 1996. Heard in the Supreme Court 10 December 1996.

*Michael F. Easley, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Sam J. Ervin, IV, for defendant-appellant.*

WHICHARD, Justice.

On 6 July 1992 defendant was indicted for three counts of first-degree murder and one count of first-degree rape, all occurring during the early morning hours of 2 November 1991. Defendant was tried capitally, and the jury returned verdicts finding him guilty of the first-degree rape and the first-degree murder of Helisa Hayes, the latter based on malice, premeditation, and deliberation and under the felony murder rule; the first-degree murder of Phillip Hayes based on malice, premeditation, and deliberation; and the first-degree murder of Darien Hayes based on malice, premeditation, and deliberation. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death for each of the three murders. The trial court sentenced defendant accordingly and additionally sentenced him to a consecutive term of life imprisonment for the first-degree rape. For the reasons set forth herein, we conclude that defendant received a fair trial, free from prejudicial error, and that the sentence of death is not disproportionate.

The evidence tended to show that in the early morning hours of 2 November 1991, defendant went to the home of victim Helisa Hayes, where she resided with her two children, Phillip and Darien. Defendant was a close friend of Helisa's ex-husband. While at the home, defendant had "forceful" sex with Helisa, beat her, and strangled her to death. Defendant then took her son Phillip into the bathroom, where defendant strangled him with the electrical cord of a

curling iron and stabbed him numerous times in his head and body with a pair of scissors. After killing Phillip, defendant went into Darien's bedroom, sat her up on her bed, and strangled her to death with a curling-iron cord.

[1] In his first assignment of error, defendant contends that the trial court erred by refusing to allow him to ask prospective jurors whether, after being informed that defendant had been previously convicted of first-degree murder, they would still be able to consider mitigating circumstances and impose a life sentence. He contends that the trial court's ruling violated his state and federal constitutional rights as enunciated in *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992). We disagree.

The question defense counsel proposed to ask prospective jurors, and the trial court's response, were as follows:

> MR. BRITT: I want to ask them if . . . knowing that he had a previous first[-]degree murder conviction, they could still consider mitigating circumstances . . . in determining what their ultimate recommendation as to life or death is going to be.

> THE COURT: I'm afraid, Mr. Britt, no matter how you want to couch the question, it is always going to come back to being a stakeout question. I will permit you to ask broad questions about whether they can consider any and all aggravating circumstances and balance that against any and all mitigating circumstances, whatever they might be.

This Court was presented with an almost identical scenario in *State v. Robinson*, 339 N.C. 263, 451 S.E.2d 196 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995). In that case, as in the case at bar, the defendant had a prior conviction for first-degree murder, and his counsel wished to ask the prospective jurors:

> [I]f you were to . . . find during the sentencing hearing that the defendant had a previous first[-]degree murder conviction prior to the murders for which he is being sentenced this week, could you still follow the Court's instructions and weigh the aggravating and mitigating circumstances and consider life imprisonment as a sentencing option.

*Id.* at 272, 451 S.E.2d at 202. This Court held this question "to be an improper attempt to 'stake out' the jurors as to their answers to legal questions before they are informed of legal principles ap-

plicable to their sentencing recommendation." *Id.* at 273, 451 S.E.2d at 202.

There is no meaningful distinction between the question proposed in *Robinson* and the one proposed here. Both seek to discover in advance what a prospective juror's decision will be under a certain state of the evidence. This Court has held that it is not permissible to ask a prospective juror how a certain set of facts would affect his or her decision. *State v. Kandies*, 342 N.C. 419, 441, 467 S.E.2d 67, 79, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 167 (1996); *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976). This is because

> such questions are confusing to the average juror who at that stage of the trial has heard no evidence and has not been instructed on the applicable law. . . . [and because] such questions tend to "stake out" the juror and cause him to pledge himself to a future course of action.

*Vinson*, 287 N.C. at 336, 215 S.E.2d at 68. Questions that seek to indoctrinate prospective jurors regarding potential issues before the evidence has been presented and jurors have been instructed on the law are impermissible. *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989).

Further, a stake-out question is not made permissible simply because it is predicated on a set of facts that is cast as uncontroverted rather than hypothetical. In *State v. Bond*, 345 N.C. 1, 478 S.E.2d 163 (1996), *cert. denied*, —— U.S. ——, 138 L. Ed. 2d 1022 (1997), the defendant was tried capitally for a first-degree murder that was committed by his cohort. During jury selection the State asked a prospective juror if he could follow the law by considering the punishment of death for an accessory who "did not actually 'pull the trigger.' " *Id.* at 14, 478 S.E.2d at 169. Defendant argued that this constituted an impermissible stake-out question. *Id.* at 16, 478 S.E.2d at 170. This Court disagreed, noting that the predicate for the State's inquiry was not a hypothetical set of facts but the uncontroverted fact that the defendant was neither "charged nor going to be tried as a principal." *Id.* at 17, 478 S.E.2d at 170. This observation should not be construed to allow any or all *voir dire* questions premised on uncontroverted facts, regardless of their tendency to stake out or indoctrinate jurors. Rather, it indicates only this Court's conclusion that the trial court did not abuse its discretion by allowing the State to inquire into the prospective jurors' ability to follow the law regarding the

**STATE v. RICHMOND**

[347 N.C. 412 (1998)]

death penalty for accessories in a manner that neither indoctrinated the venire regarding unproven facts nor committed prospective jurors to a decision prior to their being instructed on the law.

With regard to defendant's contention that the trial court here violated *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, by refusing to allow the proposed questioning, this Court has held that *Morgan* does not require that a defendant be allowed to ask stake-out questions. *See Kandies*, 342 N.C. at 440-41, 467 S.E.2d at 78-79 (holding that "Would the age of the victim in this case . . . make a difference to you as to whether you would impose a life sentence or a death sentence?" is a stake-out question which *Morgan* does not require that a defendant be allowed to ask); *State v. Lynch*, 340 N.C. 435, 451-52, 459 S.E.2d 679, 685-86 (1995) (holding that "How about in a case where a child is killed? Would you automatically tend to feel that the death penalty should be imposed?" comprise a stake-out question which *Morgan* does not require that a defendant be allowed to ask), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 558 (1996). The trial court in this case properly refused to allow questioning about defendant's prior first-degree murder conviction, while allowing defendant to ask prospective jurors whether they would be able to consider all aggravating and mitigating circumstances. This ruling did not violate *Morgan*. This assignment of error is overruled.

**[2]** In his next assignment of error, defendant contends that the trial court improperly excused for cause prospective jurors Oakman and Futch based on the conclusion that they would not be able to give fair consideration to both potential sentences because of personal feelings concerning the death penalty. Defendant argues that the trial court erred under *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985), contending that the *voir dire* of these jurors did not reveal that their views on the death penalty would prevent or substantially impair the performance of their duties as jurors as those cases require for a for-cause excusal.

The granting of a challenge for cause based on a prospective juror's unfitness is a matter within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *State v. Abraham*, 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994). "[A] prospective juror's bias may not always be 'provable with unmistakable clarity [and,] [i]n such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be

**STATE v. RICHMOND**

[347 N.C. 412 (1998)]

able to follow the law impartially.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993) (quoting *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990)) (second and third alterations in original).

During Oakman's *voir dire*, she was equivocal at times about her ability to impose the death penalty. However, on several occasions she clearly stated her inability to fairly consider the death penalty as a punishment. At one point the State asked her whether, if the trial proceeded to the sentencing stage, she "could consider, under appropriate circumstances, voting for the death penalty as a punishment." She responded, "To be honest, I think I'd have problems with it." When asked to clarify her feelings, she stated, "I just don't—I feel like, you know, you're taking a life. I mean, because they took a life is not—that's not a proper answer, to take his life. That's not going to bring them back." The State continued to probe by asking, "[D]o you think that, if called upon to make that decision, that, because of your feelings, you would vote for life imprisonment?" Oakman answered "yes." The court asked Oakman whether she could fairly consider both the death penalty and life imprisonment. She responded that she could not. The trial court was within its discretion in excusing this prospective juror for cause.

[3] Similarly, prospective juror Futch, though equivocal at times, made several statements which indicated his inability to follow the law. Futch worked for a newspaper and said he knew DNA had linked defendant to the victim and that defendant had been involved in another murder. In response to questioning by the State concerning his feelings about the death penalty, Futch stated that he was "[j]ust opposed to the idea of it." When asked how his personal feelings might impact his sentencing decision if defendant was found guilty, he stated, "I probably would go with [life imprisonment]." The trial court did not abuse its discretion by excusing this prospective juror for cause. This assignment of error is overruled.

[4] Defendant next argues that the trial court, in violation of *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, erred by failing to allow his for-cause challenge of prospective juror Richardson. Defendant contends that Richardson's responses during death qualification indicated that she would vote to sentence to death anyone convicted of first-degree murder. In response to questioning by defense counsel, Richardson indicated that she would be inclined to vote for the death penalty in the case of a murder that was "intentional, premeditated,

and without any legal justification or excuse." After questioning by the State and defendant, the trial court stated its suspicion that the prospective juror may have been confused by questions asked "in a vacuum." After explaining the process of weighing mitigating and aggravating circumstances in a sentencing proceeding, the trial court asked Richardson whether she believed she could fairly consider both sentencing alternatives. Richardson stated three times that she could. The trial court thus did not abuse its discretion when it denied defendant's for-cause challenge. This assignment of error is overruled.

[5] Defendant next assigns error to the introduction of evidence that he attended and participated in the victims' funeral. The State elicited testimony that defendant had attended the funeral of the three victims and had served as a pallbearer for one of the child victims. This testimony revealed defendant's statement that carrying the body of a victim he had killed "never gave [him] a bad feeling." Defendant argues this evidence was irrelevant and unduly prejudicial and thus inadmissible under N.C.G.S. § 8C-1, Rules 401 and 403.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). This Court has held that evidence is relevant if it "tend[s] to shed light upon the circumstances surrounding the killing." *State v. Stager*, 329 N.C. 278, 322, 406 S.E.2d 876, 901 (1991). Here, evidence of defendant's participation and demeanor at the funeral tended to shed light on the circumstances of the murders and defendant's intent at the time of the offenses. *See id.* at 321-22, 406 S.E.2d at 900-01 (holding no error in admission of evidence that the defendant was calm and not crying shortly after the victim's death and that she disposed of his personal effects the day after his funeral); *State v. Gallagher*, 313 N.C. 132, 138, 326 S.E.2d 873, 878 (1985) (holding no error in admission of evidence that the defendant did not appear to be grieving at husband's funeral). Therefore, this evidence was relevant under Rule 401.

Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1992). "Whether to exclude evidence under Rule 403 is a matter within the sound discretion of the

trial court, and its ruling may be reversed for abuse of discretion only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Collins*, 345 N.C. 170, 174, 478 S.E.2d 191, 194 (1996). The evidence complained of was probative of the circumstances surrounding the offenses and of defendant's intent. The trial court was within its discretion in ruling that its probative value was not substantially outweighed by unfair prejudice. Accordingly, this assignment of error is overruled.

**[6]** In his next assignment of error, defendant contends that the evidence was insufficient to support a finding of first-degree rape, thus undermining his conviction for the first-degree murder of the adult victim which was based, in the alternative, on the felony murder rule. He contends specifically that there was insufficient evidence that he inflicted serious personal injury on the adult victim as required by N.C.G.S. § 14-27.2(a)(2)(b).

In determining whether serious personal injury has been inflicted for purposes of satisfying the elements of first-degree rape, "the court must consider the particular facts of each case." *State v. Herring*, 322 N.C. 733, 739, 370 S.E.2d 363, 367 (1988). The element of infliction of serious personal injury is satisfied

> when there is a series of incidents forming one continuous transaction between the rape or sexual offense and the infliction of the serious personal injury. Such incidents include injury inflicted on the victim to overcome resistance or to obtain submission, injury inflicted upon the victim or another in an attempt to commit the crimes or in furtherance of the crimes of rape or sexual offense, or injury inflicted upon the victim or another for the purpose of concealing the crimes or to aid in the assailant's escape.

*State v. Blackstock*, 314 N.C. 232, 242, 333 S.E.2d 245, 252 (1985).

Defendant argues that this Court's decisions in *State v. Thomas*, 332 N.C. 544, 423 S.E.2d 75 (1992), and *State v. Boone*, 307 N.C. 198, 297 S.E.2d 585 (1982), establish that in cases of first-degree rape, serious personal injury does not include injury that results in death. Defendant further contends that the evidence of injury aside from that leading to death in this case is insufficient to satisfy the serious personal injury requirement.

The rule that serious personal injury cannot include injury causing death appears to have its genesis in *State v. Jones*, 258 N.C. 89,

STATE v. RICHMOND

[347 N.C. 412 (1998)]

128 S.E.2d 1 (1962), a case involving the charge of assault with a deadly weapon with intent to kill. The charge in *Jones* was brought under a statute then codified as N.C.G.S. § 14-32. *Id.* at 90, 128 S.E.2d at 2. This statute included as an element that the assault "inflicts serious injury not resulting in death." *Id.* This Court gave this element its plain meaning. *Id.* at 91, 128 S.E.2d at 3. It was logical for the General Assembly to limit the injuries capable of supporting assault charges to those that do not cause death because injury causing death would have elevated the assault to murder. For the crime to be punishable as an assault, it was necessary that the injury fall short of death.

In *Boone*, 307 N.C. 198, 297 S.E.2d 585, this Court addressed the question of whether a mental injury was sufficient to satisfy the serious personal injury requirement in a case of attempted first-degree rape. The Court cited *Jones*, the assault case, for its definition of serious bodily injury, including language which stated that "[t]he injury must be serious but it must fall short of causing death." *Id.* at 203, 297 S.E.2d at 588-89. In *Thomas*, a case involving a first-degree sexual offense conviction, this Court cited *Boone* for the proposition that serious personal injury cannot include injury resulting in death. *Thomas*, 332 N.C. at 555, 423 S.E.2d at 81. *Thomas* thus completed the migration of this restricted definition of serious injury from the assault context to the sexual offense and rape context.

This restricted definition was not essential to the holding of either *Boone* or *Thomas*. Further, unlike the assault statute at issue in *Jones*, the statutes governing first-degree rape and first-degree sexual offense do not limit the injuries underlying the charge to those not resulting in death. N.C.G.S. §§ 14-27.2, 14-27.4 (Supp. 1997). While defining serious injury to exclude fatal injuries is appropriate in the context of assault charges, the underlying logic does not extend to cases of first-degree rape and sexual offense. Serious injuries that prove fatal transform an assault into a murder, but they do not similarly change a first-degree rape into a different crime. Rather, it is proper, based on such facts, to charge a defendant with both first-degree rape and murder. Fatal injuries are obviously serious, and it would be absurd to allow a defendant to escape a first-degree rape conviction because his victim did not survive the injuries he inflicted in the course of the sexual assault. Any language in *Thomas* and *Boone* suggesting that the serious personal injury element of first-degree rape or sexual offense cannot be injury causing death is therefore disavowed.

STATE v. RICHMOND

[347 N.C. 412 (1998)]

Here, there was sufficient evidence to support the element of serious personal injury. In the opinion of Dr. John D. Butts, the medical examiner who performed the autopsy, the adult victim died as the result of strangulation. She had numerous blunt-force injuries; tears, scrapes, and bruises; abrading of the skin in the entrance to her vagina; and blood over a portion of her brain beneath a bruise on her scalp. Defendant's first-degree rape conviction properly supports his conviction for the first-degree murder of the adult victim under the felony murder theory. This assignment of error is overruled.

[7] Next, defendant assigns error to the trial court's refusal to submit second-degree murder to the jury in connection with the murders of the two children. Murder in the first degree, the crime of which defendant was convicted with regard to all three victims, is the "intentional and unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 337 (1986). Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Brown*, 300 N.C. 731, 735, 268 S.E.2d 201, 204 (1980). A defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support it. *Id.* at 735-36, 268 S.E.2d at 204. "The sole factor determining the judge's obligation to give such an instruction is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense." *State v. Wright*, 304 N.C. 349, 351, 283 S.E.2d 502, 503 (1981).

Defendant argues that there was evidence that permitted a finding that he did not kill the child victims with premeditation and deliberation. Specifically, he argues that evidence was presented which indicated that he killed the children after an altercation with their mother and that he had consumed alcohol and cocaine that night. Defendant contends that this evidence was sufficient to convince a rational trier of fact that the murders of the two children did not involve premeditation and deliberation, thus entitling him to a jury instruction on second-degree murder. We disagree.

The evidence showed that after defendant killed the adult victim, he awakened one child, took him into the bathroom, wrapped a cord around his neck five times, and stabbed him at least twenty times in the head and body with a pair of scissors. Defendant then went into the other child's room, awakened her, sat her on the edge of the bed,

and strangled her with the cord of a curling iron. This evidence shows that defendant acted with deliberation and does not show anger or emotion that overcame his reason so as to reduce the killing to second-degree murder. A rational trier of fact could not have convicted defendant of second-degree murder under this evidence. This assignment of error is overruled.

[8] In his next assignment of error, defendant contends that the trial court erred by refusing to instruct the jury on voluntary intoxication. He argues that the evidence showed that he had consumed crack cocaine and large amounts of alcohol on the night of the murders and that his mental faculties were consequently impaired. He argues that, based on this evidence, he was incapable of forming the specific intent required for a first-degree murder conviction.

We have stated the law on voluntary intoxication as follows:

A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

The evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. In [the] absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon.

State v. Strickland, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987) (quoting State v. Medley, 295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978)) [(citations omitted)].

State v. Mash, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988).

Here, the evidence showed at best that defendant was intoxicated at some time prior to the murders. While defendant may have consumed alcohol and cocaine prior to the murders, there is little evidence of the degree of his intoxication at the time of the murders.

Defendant argues that because he was unable to recall the murders clearly, he must have been severely intoxicated at the time. The evidence, however, suggests that defendant methodically killed everyone in the house, leading one victim into the bathroom and sitting another on the edge of the bed. He also tried to hide his crimes by pouring alcohol on the adult victim's genitals and taking with him the scissors he had used to stab one of the child victims. Such behavior is indicative of a capacity for premeditation and deliberation. Defendant has not made the necessary showing that he was "utterly incapable" of forming the requisite intent. *State v. Skipper*, 337 N.C. 1, 36, 446 S.E.2d 252, 271 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). This assignment of error is overruled.

**[9]** Defendant next assigns error to the trial court's failure to intervene *ex mero motu* in response to statements the prosecutor made during closing arguments. Defendant did not object to any of the challenged comments at trial. "In deciding whether the trial court improperly failed to intervene *ex mero motu* to correct an allegedly improper argument of counsel at final argument, our review is limited to discerning whether the statements were so grossly improper that the trial judge abused his discretion in failing to intervene." *State v. Holder*, 331 N.C. 462, 489, 418 S.E.2d 197, 212 (1992).

Defendant contends that the prosecutor improperly commented on defendant's failure to testify when discussing the evidence of his intoxication on the night of the murders. The prosecutor pointed out that defendant never told anyone he had been drinking or taking drugs that night. The prosecutor argued, "What you did hear was two sisters—and I'm sure they love him deeply, no matter what he has done. Out of 35 or 40 people at that party, why are the only two that you hear his own relatives, his own blood kin?" These statements did not improperly comment on defendant's failure to testify. Rather, they properly suggested potential bias in defendant's sisters' testimony concerning the degree of his intoxication. *See State v. Brown*, 327 N.C. 1, 20, 394 S.E.2d 434, 445-46 (1990) (holding it proper for prosecutor to argue that jury should scrutinize the testimony of a witness for bias).

**[10]** Defendant also contends that the prosecutor misstated the law concerning the serious personal injury element of first-degree rape. While telling the jury what the court would instruct on first-degree rape, the prosecutor said that "the State must prove that the Defendant inflicted serious personal injury upon the victim," and

remarked, "Doesn't get any more serious than death. This is a serious injury." As clarified above, this was a proper statement of the law.

[11] Defendant adds that the prosecutor erred by stating that the mere act of choking someone establishes premeditation and deliberation. The prosecutor stated:

> And I submit to you that you have to premeditate when you choke someone to death. It's not like pulling out a gun and snapping a shot off. It's as deliberate, as premeditated an act as you can have. Some time period, however short. When you have to walk all the way to a back bedroom and you take a cord back there with you, that is premeditation. Nothing but. When you take an 8-year-old to the floor, who is struggling, and you stab him and stab him and stab him; when you drive an instrument all the way through his body, that is premeditation.

Defendant contends that this argument is contrary to this Court's description of premeditation and deliberation in *State v. Walters*, 275 N.C. 615, 170 S.E.2d 484 (1969), where we said it is sufficient if these mental processes occur prior to, and not simultaneously with, the killing. *Id.* at 623, 170 S.E.2d at 490.

This Court has explained the element of premeditation and deliberation in greater detail in other cases. We have recognized that because "premeditation and deliberation are processes of the mind, they are not ordinarily subject to direct proof but generally must be proved if at all by circumstantial evidence." *State v. Huffstetler*, 312 N.C. 92, 109, 322 S.E.2d 110, 121 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). The brutal manner of the killing and the nature of the victim's wounds are circumstances from which the jury can infer premeditation and deliberation. *State v. Jackson*, 317 N.C. 1, 23, 343 S.E.2d 814, 827 (1986), *vacated on other grounds*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987). The jury may infer premeditation and deliberation from the circumstances of a killing, including the fact that death was by strangulation. *State v. Vereen*, 312 N.C. 499, 515, 324 S.E.2d 250, 260 (holding evidence of a brutal attack, sexual assault, and strangulation sufficient to support a finding of premeditation and deliberation), *cert. denied*, 471 U.S. 1094, 85 L. Ed. 2d 526 (1985); *State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983) (finding sufficient evidence of premeditation and deliberation where victim was bound and died of strangulation), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986).

STATE v. RICHMOND

[347 N.C. 412 (1998)]

The prosecutor's argument was not a misstatement of the law or of the facts. The trial court thus did not err by failing to intervene *ex mero motu*.

**[12]** Finally, defendant contends that the prosecutor misstated the evidence when he argued that defendant killed Darien Hayes to eliminate a witness. The prosecutor stated that defendant intended to "eliminate somebody that might be a possible witness" to her mother's rape and murder. Defendant argues this statement is not supported by the evidence because the evidence shows that Darien Hayes was asleep while her mother and brother were being murdered.

This is not a gross misstatement of the evidence. Had the child lived, she certainly would have been a possible witness to the events before and after, if not during, the murders. None of the statements defendant complains of was so grossly improper as to require the trial court to intervene *ex mero motu*. This assignment of error is therefore overruled.

**[13]** Defendant next assigns error to the trial court's charge on first-degree murder based on malice, premeditation, and deliberation in the cases of Helisa and Darien Hayes. The trial court instructed as follows:

Malice means not only hatred, ill-will or spite, as it is ordinarily understood. To be sure, that is malice. But it also means that condition of mind that prompts a person to take the life of another intentionally or to intentionally inflict serious injury upon another which proximately results in her death without just cause, excuse or justification, or *to wantonly act in such a manner as to manifest depravity of mind, a heart devoid of a sense of social [duty] and a callous disregard for human life.*

(Emphasis added.) Defendant contends that although such "wanton malice" or "depraved heart" malice may support a conviction for second-degree murder, the type of unintentional conduct associated with such malice is inconsistent with guilt of first-degree murder on the basis of malice, premeditation, and deliberation, which necessarily involves a specific intent to kill.

Contrary to defendant's contentions, depraved-heart malice can support a first-degree murder conviction provided the State proves premeditation and deliberation. *See State v. Rose*, 335 N.C. 301, 329-30, 439 S.E.2d 518, 533-34 (upholding use of the same pattern

jury instruction in a case of first-degree murder based on premeditation and deliberation), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994). The trial court properly instructed the jury on malice, specific intent, premeditation, and deliberation in its first-degree murder instructions. Further, there was sufficient evidence of malice, premeditation, and deliberation to support defendant's three first-degree murder convictions based on this theory. This assignment of error is overruled.

[14] In his next assignment of error, defendant contends that the trial court committed prejudicial error by admitting testimony of Arthur Nadeau that was not within his personal knowledge and constituted inadmissible hearsay. At defendant's sentencing proceeding, the State introduced a certified copy of a criminal judgment wherein defendant had been convicted of murder in the United States District Court, District of New Jersey, on 28 May 1993. The victim was Lisa Ann Nadeau. The State called her father, Arthur Nadeau, as a witness, and he identified photographs of his daughter at the autopsy and the crime scene in addition to testifying about the cause of her death.

Defendant contends that the trial court erred by permitting the State to present the circumstances surrounding the death of Ms. Nadeau through the testimony of Mr. Nadeau. Defendant concedes that the North Carolina Rules of Evidence do not apply to capital sentencing proceedings but argues that according to the United States Supreme Court's interpretation of the Sixth Amendment's Confrontation Clause in *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608 (1980), such hearsay evidence is prohibited unless the State proves the hearsay declarant is unavailable or that the evidence is reliable.

In *Idaho v. Wright*, 497 U.S. 805, 111 L. Ed. 2d 638 (1990), the Court explained in greater detail the Confrontation Clause's requirements with respect to hearsay evidence. To comport with the Confrontation Clause, hearsay must contain sufficient "indicia of reliability." *Id.* at 815-16, 111 L. Ed. 2d at 652-53. "[T]he 'indicia of reliability' requirement [can] be met in either of two circumstances: where the hearsay statement 'falls within a firmly rooted hearsay exception,' or where it is supported by 'a showing of particularized guarantees of trustworthiness.' " *Id.* at 816, 111 L. Ed. 2d at 653 (quoting *Roberts*, 448 U.S. at 66, 65 L. Ed. 2d at 608). These guarantees of trustworthiness are based on the totality of the circumstances "sur-

round[ing] the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 820, 111 L. Ed. 2d at 655-56.

The hearsay at issue consisted of Mr. Nadeau's recitation of Ms. Nadeau's cause of death, a description of her injuries, the position of her body after her death, and the identification of certain photographs of her body. Defendant points out that Mr. Nadeau is not a pathologist and was not present when his daughter's body was discovered. Defendant contends that Mr. Nadeau's testimony thus consists of hearsay not within a recognized exception to the hearsay rule.

Assuming this hearsay testimony not to be within a recognized exception, we review it to determine whether it is supported by "particularized guarantees of trustworthiness." *Id.* at 816, 111 L. Ed. 2d at 653. Though Mr. Nadeau was not present when his daughter's body was discovered, he actively followed the investigation of the murder and attended defendant's trial "[f]rom day one." It is not clear from the record from whom Mr. Nadeau received the information regarding his daughter's injuries and cause of death. Given his paternal relationship to the victim and his intense involvement in the case, however, we are satisfied that his testimony concerning how his daughter was murdered and the injuries she sustained as well as his identification of postmortem photographs of her were sufficiently reliable to satisfy the requirements of the Confrontation Clause. Moreover, error, if any, in the admission of such testimony was harmless beyond a reasonable doubt because clearly competent evidence of defendant's first-degree murder conviction for this offense was admitted in the form of a certified copy of his criminal judgment. This evidence adequately supported the trial court's submission of the (e)(3) aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of violence to the person. *See State v. Roper*, 328 N.C. 337, 359-60, 402 S.E.2d 600, 612-13 (employing similar analysis), *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991). This assignment of error is overruled.

**[15]** Defendant next contends that the trial court erred by admitting Mr. Nadeau's testimony that the victim of defendant's prior violent felony was survived by two small children. Defendant argues this evidence was irrelevant and therefore inadmissible. We disagree.

In *State v. Reeves*, 337 N.C. 700, 448 S.E.2d 802 (1994), *cert. denied*, 514 U.S. 1114, 131 L. Ed. 2d 860 (1995), this Court held that the trial court properly admitted evidence that the victim was a good

person, wife, and mother who died not knowing what had happened to her two-and-a-half-year-old child. *Id.* at 722-23, 448 S.E.2d at 811. The evidence in this case is closely analogous to that held admissible in *Reeves*. This case differs from *Reeves* in that the evidence in *Reeves* pertained to the victim of the crime for which the defendant was being sentenced, while this case involves evidence pertaining to a victim in a crime for which defendant had previously been convicted and sentenced. In *Reeves* this Court concluded that this type of evidence was "relevant to give the jury information as to all the circumstances of the crime." *Id.* at 723, 448 S.E.2d at 811. We conclude that the evidence at issue here is similarly relevant for the jury's deliberations. This assignment of error is overruled.

Defendant next contends that the trial court erred by refusing to submit the following nonstatutory mitigating circumstances to the jury: (1) defendant had a long-standing alcohol abuse problem; (2) defendant had a long-standing cocaine abuse problem; (3) defendant's use of alcohol and drugs tended to make him act in a violent manner; (4) defendant never received proper treatment for his psychological problems; (5) defendant has had a positive influence on other inmates; and (6) since his arrest, defendant has sought forgiveness for his crimes from God.

> In order for defendant to succeed on this assignment, he must establish that (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury.

*State v. Benson*, 323 N.C. 318, 325, 372 S.E.2d 517, 521 (1988). If a proposed nonstatutory mitigating circumstance is subsumed in other statutory or nonstatutory mitigating circumstances which are submitted, it is not error for the trial court to refuse to submit it. *Id.* at 327, 372 S.E.2d at 521-22.

[16] With regard to the proposed circumstances that defendant had long-standing alcohol and cocaine abuse problems, we conclude that both were subsumed by other circumstances submitted to the jury. The trial court submitted the following nonstatutory mitigating circumstances: (1) defendant has suffered and suffers from a mixed substance abuse problem; (2) the crime was committed while defendant was under the influence of alcohol; (3) the crime was committed while defendant was under the influence of crack-cocaine; and (4) defendant's use of alcohol and drugs had an effect on his behavior.

The trial court further submitted the statutory (f)(2) mitigating circumstance, "[t]he murder was committed while this defendant was under the influence of mental or emotional disturbance," and the statutory (f)(9) "catchall" mitigating circumstance, "[a]ny other circumstance or circumstances arising from the evidence which any one of you deems to have mitigating value." Because these submitted mitigating circumstances subsumed both proposed circumstances in question, the trial court did not err by refusing to submit them.

The proposed circumstance that defendant's use of alcohol and drugs tended to make him act violently was also subsumed in submitted mitigating circumstances. The trial court submitted as nonstatutory mitigating circumstances: (1) defendant's use of alcohol and drugs had an effect on his personality, and (2) defendant's use of alcohol and drugs had an effect on his behavior. Further, as indicated above, the trial court also submitted the statutory (f)(2) circumstance that the crime was committed while defendant was under the influence of a mental or emotional disturbance and the (f)(9) circumstance, the catchall. These circumstances allowed the jury to consider all of the mitigating evidence raised by the proposed circumstance at issue.

[17] It is not clear that the proposed circumstance that defendant was never given proper treatment for his psychological problems has mitigating value, because there was no evidence that defendant ever sought or requested such treatment. Assuming the proposed circumstance to be mitigating, however, it was subsumed by the following nonstatutory circumstances that were submitted: (1) defendant suffered and suffers from a mixed substance abuse problem, (2) defendant suffers from a severe personality disorder, and (3) defendant has suffered from chronic depression. In addition, the (f)(9) circumstance allowed further consideration of any mitigating evidence raised by this proposed circumstance.

[18] The proposed mitigating circumstance that defendant has had a positive influence on other inmates was subsumed by the following nonstatutory circumstances that were submitted: (1) defendant has exhibited good conduct in jail following his arrest, and (2) defendant has helped other inmates develop their religious faiths.

[19] Finally, the proposed mitigating circumstance that defendant has sought forgiveness from God was subsumed in the following circumstance: since his arrest, defendant has sought forgiveness for his crimes. This circumstance, combined with the (f)(9) catchall circum-

stance, provided an adequate vehicle for the jury to consider the mitigating value of this evidence. This assignment of error is overruled.

[20] Defendant next assigns error to the trial court's refusal to peremptorily instruct the jury with respect to one statutory and ten nonstatutory mitigating circumstances. "[A] trial court should, if requested, give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted and manifestly credible evidence." *State v. McLaughlin*, 341 N.C. 426, 449, 462 S.E.2d 1, 13 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 879 (1996).

Defendant first argues that the trial court should have given a peremptory instruction on the (f)(2) statutory mitigating circumstance, that he was under the influence of a mental or emotional disturbance at the time of the murders. Whether defendant was under the influence of such a disturbance when he committed the crimes was controverted by the State's evidence, however. The State's experts testified that the existence of any psychological problems in defendant did not necessarily mean that these problems influenced defendant at the time. These experts also testified that defendant's behavior during the commission of the crimes was goal-directed, which indicates that he was not influenced by a mental or emotional disturbance at the time.

[21] Defendant next argues he was entitled to a peremptory instruction on the circumstance that he had a severe personality disorder. All of the evidence supporting this circumstance came from mental health professionals who conducted their evaluations in preparation for this criminal trial. As a result, this evidence lacks sufficient indicia of reliability to permit the conclusion that it is manifestly credible. *See State v. Bishop*, 343 N.C. 518, 557-58, 472 S.E.2d 842, 863 (1996) (holding that a social history prepared for trial testimony, rather than for treatment, "lacks the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment"), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 723 (1997). The trial court thus did not err in failing to peremptorily instruct the jury on this circumstance.

[22] Defendant next argues that the following three circumstances concerning his childhood should have received peremptory instructions: (1) defendant was reared in a family whose father was an alcoholic, (2) defendant's father introduced him to alcohol at an early age, and (3) defendant's father attempted to introduce him to adult sexual

STATE v. RICHMOND

[347 N.C. 412 (1998)]

experiences at an early age. These circumstances were based largely on the testimony of defendant's sister. Because it is common for a defendant's family members to be biased in his favor, the evidence supporting these circumstances is not manifestly credible. The trial court thus properly refused to peremptorily instruct the jury on this circumstance.

[23] Defendant next contends that the trial court should have peremptorily instructed the jury with regard to the mitigating circumstances that: (1) defendant confessed to law enforcement officers; and (2) upon his arrest, defendant cooperated with law enforcement officers and submitted to multiple interviews over several days. The evidence supporting these circumstances was clearly controverted because defendant initially lied to the officers about his involvement in the murders, maintaining his innocence even after DNA evidence showed he was the donor of semen found in the adult victim. These circumstances thus did not merit peremptory instructions.

[24] Defendant next argues that the following circumstance should have received a peremptory instruction: defendant would adjust well to prison life. Evidence was presented that defendant told an officer, "I can't say I won't kill again. S— just happens." This evidence indicates that defendant freely acknowledged his future dangerousness, thus controverting any evidence suggesting he would be a well-behaved prisoner.

[25] The next circumstance that defendant argues should have received a peremptory instruction was that "defendant has expressed remorse for the murders he has committed." This was controverted by evidence that when asked about being a pallbearer at the funeral of one of the child victims, defendant responded, "It never gave me a bad feeling."

[26] Defendant next argues that evidence supporting the circumstance that "defendant has exhibited good conduct in jail following his arrest" warranted a peremptory instruction. The State presented evidence which indicated that while defendant was in pretrial confinement, he was interviewed by Dr. Louis Schlesinger and fabricated stories about when and why he poured alcohol over the adult victim's genitals. This evidence controverts the circumstance in question.

[27] Finally, defendant contends that the trial court should have peremptorily instructed the jury regarding the circumstance that

"defendant has helped other inmates develop their religious faiths." While there was evidence that defendant was involved in prison ministry, there was no evidence that his efforts had in fact aided in the development of another inmate's faith. There was evidence that defendant gave other inmates positive things to think about based on the Bible and that one inmate was attending Bible study more frequently due to defendant's efforts. There was no evidence, however, as to the effect of defendant's admonitions on other inmates or of the Bible study attendance on this one inmate. The evidence thus did not require a peremptory instruction that "defendant has helped other inmates develop their religious faiths." This assignment of error is overruled.

**[28]** Defendant next assigns error to the trial court's failure to intervene *ex mero motu* on a number of occasions during the State's sentencing phase argument to the jury. Argument that passes without objection by defense counsel at trial "must be gross indeed for this Court to hold that the trial court abused its discretion in not recognizing and correcting *ex mero motu* the comments regarded by defendant as offensive only on appeal." *Brown*, 327 N.C. at 19, 394 S.E.2d at 445. Further, in carrying out their duty to advocate zealously that the facts in evidence warrant imposition of the death penalty, prosecutors are permitted wide latitude in their arguments. *State v. Geddie*, 345 N.C. 73, 97, 478 S.E.2d 146, 158 (1996), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 43, 66 U.S.L.W. 3255 (1997).

Defendant first contends that the State improperly focused on one aspect of the concept of mitigation to the exclusion of others. The State repeatedly focused on the idea that mitigation is that which reduces moral culpability, while neglecting to argue that mitigating value may also be based on a defendant's age, character, prior record, mentality, education, habits, and environment. As we recognized when presented with substantially the same argument in *State v. Bishop*, 343 N.C. 518, 472 S.E.2d 842, although these factors "may be relevant considerations in a sentencing hearing, these words are not essential to the basic definition of a mitigating circumstance." *Id.* at 552, 472 S.E.2d at 860. It was not error for the trial court to abstain from intervention *ex mero motu* here.

**[29]** Defendant next contends that the trial court should have intervened *ex mero motu* when the State argued that the jury should not find defendant's voluntary consumption of alcohol and drugs mitigating. Defendant contends that the State's argument was tantamount to

misstating North Carolina law, which allows voluntary intoxication to be considered as mitigating evidence. The statement was not one of law, however, but one of advocacy; it did not tell the jury that it could not find this evidence mitigating, but that it should not. This was well within the wide latitude permitted to prosecutors in their arguments. It did not require intervention *ex mero motu*.

[30] Defendant next contends that the State's arguments regarding the mitigating circumstances which focused on defendant's dysfunctional family and his father's alcoholism warranted intervention *ex mero motu*. The State argued that "[e]very one of us grew up in a dysfunctional family"; that "you've probably got a dysfunctional family right now if you let the psychologists look at it and tell you about it"; that "[e]very one of us has got some kind of psychological problems, basically"; and that "[h]e didn't grow up any better or any worse than 95 percent of us and 95 percent of you." With regard to defendant's father being an alcoholic, the State argued, "[w]elcome, probably, to about 35 percent of the world." While these comments may have been oversimplifications, they were within the wide latitude allowed parties in hotly contested cases.

[31] Finally, defendant contends that the trial court should have intervened *ex mero motu* when the State argued that it was an insult to the jurors' intelligence for defendant to claim that his recent religious activity should be considered mitigating, as well as when the State sarcastically suggested that defendant's service as a pallbearer at the funeral of one of the victims should be included in the (f)(9) catchall mitigating circumstance. Neither of these arguments was so egregious that the trial court should have intervened in the absence of an objection by defendant. This assignment of error is overruled.

[32] Defendant next assigns error to the trial court's refusal to allow him to inform the jury that he was serving a federal sentence of life without parole for a prior murder conviction. Defendant contends specifically that the trial court erred in denying his motions (1) to permit *voir dire* of prospective jurors regarding their conceptions of parole eligibility, (2) to be allowed to inform the jury as to the law in North Carolina regarding parole eligibility on a life sentence for first-degree murder, and (3) to permit psychiatric testimony concerning defendant's parole ineligibility under his federal conviction and its effect on his current mental state and adjustment to incarceration. Defendant acknowledges that this Court has held contrary to his con-

tentions in *State v. McLaughlin,* 341 N.C. 426, 462 S.E.2d 1; *State v. Price,* 337 N.C. 756, 448 S.E.2d 827 (1994), *cert. denied,* 514 U.S. 1021, 131 L. Ed. 2d 224 (1995); and *State v. Bacon,* 337 N.C. 66, 446 S.E.2d 542 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). We decline to revisit our prior holdings here.

**[33]** Defendant further contends that, following the State's final summation, the trial court erred by rejecting his request for a jury instruction informing jurors that defendant is ineligible for parole under his federal sentence. Defendant argues, based on *Simmons v. South Carolina,* 512 U.S. 154, 129 L. Ed. 2d 133 (1994), that because the State argued defendant's future dangerousness, he was entitled to such an instruction.

*Simmons* involved a murder prosecution in South Carolina in which the jury's sentencing options were limited to either the death penalty or life imprisonment. According to the state law applicable to the defendant in *Simmons,* a life sentence meant imprisonment for life without the possibility of parole. During the sentencing phase argument, the prosecutor in *Simmons* argued that the question for the jury was "what to do with [the defendant] now that he is in our midst." *Id.* at 157, 129 L. Ed. 2d at 139. The prosecutor further argued that a death sentence would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense." *Id.* The defendant requested that the trial court instruct the jury that the defendant would never be eligible for parole under South Carolina law. *Id.* at 158, 129 L. Ed. 2d at 139. The trial court refused to so instruct. *Id.* at 159-60, 129 L. Ed. 2d at 140.

The Supreme Court, in a plurality opinion, recognized that

> prosecutors . . . frequently emphasize a defendant's future dangerousness in their evidence and argument at the sentencing phase; they urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison.

*Id.* at 163, 129 L. Ed. 2d at 142. The Court then noted:

> In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. . . . Indeed, there may be no greater assurance of a defendant's future non-dangerousness to the public than the fact that he never will be released on parole.

*Id.* at 163-64, 129 L. Ed. 2d at 142. The Court limited its analysis to arguments by the State regarding dangerousness to the public, stating:

> Of course, the fact that a defendant is parole ineligible does not prevent the State from arguing that the defendant poses a future danger. The State is free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff.

*Id.* at 165 n.5, 129 L. Ed. 2d at 143 n.5. It concluded:

> The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole.

*Id.* at 171, 129 L. Ed. 2d at 147.

The Court thus sought to protect against prosecutorial arguments that mislead jurors into believing that if they do not sentence a defendant to death, he will eventually be released from prison and once again be a threat to society. If a defendant would be imprisoned for life in the absence of a death sentence, then when the State makes such an argument, *Simmons* requires that the defendant be allowed to inform the jury of the nature of his life-without-parole sentence. If, on the other hand, the State refers to future dangerousness only in terms of dangerousness while incarcerated, the concerns of the Court in *Simmons* are not implicated.

Read as a whole, the State's closing argument here did not set up a false dilemma like that addressed in *Simmons*. During the course of the State's closing argument, the prosecutor commented on the proposed nonstatutory mitigating circumstance that defendant was not able to form close relationships with others. The State argued that "the people [defendant] gets close and intimate to, die," and "[t]hank God he doesn't get too close and intimate with people because they die." These statements referred to the evidence that defendant's murders had been perpetrated on women he had known for some period of time and with whom he had had sexual relations. This was not argumentation about defendant's future dangerousness.

Later, the prosecutor focused on the mitigating circumstance that defendant had exhibited good conduct in jail following his arrest. The

State argued that defendant "can control himself when he wants to control himself" and that the "[p]roblem is, you and I don't know when he's going to want to and when he's not, even in a jail cell." To the extent this argument implies that defendant may be dangerous in the future, the State clearly focused on the possibility of his dangerousness while incarcerated. The rule announced in *Simmons* is not triggered by arguments that a defendant may be dangerous while in prison. The potential for dangerousness in prison exists apart from eligibility for parole.

Focusing on the mitigating circumstance that defendant "would adjust well to prison life," the State argued, "[A]re you convinced he won't kill in prison? Are you convinced he won't kill now?" As described above, the rule in *Simmons* is not implicated by arguments about future dangerousness while incarcerated.

Finally, in the State's final remarks to the jury, the prosecutor argued:

> All I ask you to do is pay close attention to what Judge Johnson says and use your common sense . . . . When you know that someone has killed not just once, Lisa Ann Nadeau, not just twice, H[e]lisa Hayes, not just three times, Darien Hayes, not just four times, Philip Hayes. Four times, folks. What does it take? What does it take? There is only one way you can ensure that this Defendant does not kill again, and that is to impose the penalty that he has earned and worked for and deserves. I ask you to impose the death penalty on all three cases.

These remarks followed the State's argument that defendant's conduct "in a jail cell" could not be predicted and that it was possible he would kill again "in prison." Read in context, the State's argument does not present the type of danger that concerned the Supreme Court in *Simmons*. The trial court did not err by refusing to instruct the jury as to the nature of defendant's federal sentence. This assignment of error is overruled.

[34] Defendant next assigns error to the manner in which some of the jurors were polled regarding their recommendation of three death sentences. N.C.G.S. § 15A-2000(b) requires, in pertinent part:

> Upon delivery of the sentence recommendation by the foreman of the jury, the jury shall be individually polled to establish whether each juror concurs and agrees to the sentence recommendation returned.

N.C.G.S. § 15A-2000(b) (1997). The clerk in the trial court questioned each juror individually regarding each of the three death sentences. With respect to each, the clerk asked each juror:

> As to Count No. [], the jury has returned as its recommendation that the Defendant be sentenced to death. Is that your recommendation?

Following each juror's affirmative response, the clerk then asked each juror, "Do you still assent thereto?" Each juror answered this question affirmatively as well. During the questioning of three jurors, however, the clerk failed to ask, "Do you still assent thereto," with respect to one of defendant's murder convictions; and during the questioning of one juror, the clerk failed to ask, "Do you still assent thereto," with respect to two of defendant's murder convictions. Defendant argues that this omission amounts to a violation of N.C.G.S. § 15A-2000(b), thus entitling him to a new sentencing proceeding. We disagree.

N.C.G.S. § 15A-2000(b) requires the polling of the jury to establish "whether each juror concurs and agrees to the sentence recommendation returned." The clerk informed every juror with respect to all three of defendant's convictions that the jury had recommended "that the Defendant be sentenced to death." The clerk then asked every juror, again with respect to each of defendant's three convictions, "Is this *your* recommendation?" This questioning satisfies the requirements of N.C.G.S. § 15A-2000(b) because it establishes that each individual juror agreed with the sentence recommendation returned by the jury with respect to each of defendant's convictions. This assignment of error is overruled.

Defendant next raises several issues which he concedes this Court has decided against his position, including: (1) that North Carolina's capital sentencing scheme is unconstitutional; (2) that the short-form indictment drawn in accordance with N.C.G.S. § 15-144 is unconstitutional; (3) that the State should have been prohibited from exercising peremptory challenges to remove jurors who had expressed some hesitancy about being able to return a sentence of death; (4) that the trial court should have allowed defendant on *voir dire* to ask prospective jurors whether they could consider specific mitigating circumstances during the sentencing phase; (5) that the trial court's instruction that malice may be inferred from an intentional killing with a deadly weapon is unconstitutional; (6) that the trial court's refusal to grant defendant the right of allocution violated

his constitutional rights; (7) that the admission of evidence pertaining to the facts and circumstances surrounding defendant's prior violent felony violated his constitutional rights; (8) that the trial court's instruction to the jury that it might consider all of the evidence introduced during both phases of the trial in making a sentencing recommendation violated his constitutional rights; (9) that the trial court's instructions concerning the (e)(4) and (e)(11) statutory aggravating circumstances violated his constitutional rights; (10) that the trial court's definition of "mitigating circumstance" violated his constitutional rights; (11) that the trial court's failure to peremptorily instruct the jury with regard to certain proposed nonstatutory mitigating circumstances in spite of the lack of manifestly credible evidence supporting them violated his constitutional rights; (12) that the trial court's instructions regarding the weighing of aggravating and mitigating circumstances violated his constitutional rights; (13) that the (e)(3) statutory aggravating circumstance is unconstitutional; (14) that the (e)(4) statutory aggravating circumstance is unconstitutional; (15) that the (e)(5) statutory aggravating circumstance is unconstitutional; (16) that the (e)(9) statutory aggravating circumstance is unconstitutional; (17) that the (e)(11) statutory aggravating circumstance is unconstitutional; (18) that the trial court's refusal to instruct the jury that all twelve jurors must agree in order to sentence defendant to death and that if the jurors could not agree the trial court was required by law to impose a sentence of life imprisonment violated his constitutional rights; and (19) that the trial court's instructions regarding nonstatutory mitigating circumstances violated his constitutional rights. We have reviewed defendant's arguments, and we find no compelling reason to reconsider our prior holdings. These assignments are overruled.

[35] Having found no error in defendant's trial or separate sentencing proceeding, we are required to review the record and determine: (1) whether the evidence supports the aggravating circumstances found by the jury; (2) whether passion, prejudice, or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

With respect to the murder of Helisa Hayes, the jury found as aggravating circumstances that defendant had been previously convicted of a felony involving the use of violence to the person; the murder was committed by defendant while he was engaged in the

commission of or an attempt to commit first-degree rape; and the murder was part of a course of conduct in which defendant engaged, and that course of conduct included the commission by defendant of other crimes of violence against another person or persons.

With respect to the murder of Phillip Hayes, the jury found as aggravating circumstances that defendant had been previously convicted of a felony involving the use of violence to the person; the murder was committed for the purpose of avoiding or preventing a lawful arrest; the murder was especially heinous, atrocious, or cruel; and the murder was part of a course of conduct in which defendant engaged, and that course of conduct included the commission by defendant of other crimes of violence against another person or persons.

With respect to the murder of Darien Hayes, the jury found as aggravating circumstances that defendant had been previously convicted of a felony involving the use of violence to the person; the murder was committed for the purpose of avoiding or preventing a lawful arrest; and the murder was part of a course of conduct in which defendant engaged, and that course of conduct included the commission by defendant of other crimes of violence against another person or persons.

We conclude that the record fully supports the jury's finding of these aggravating circumstances. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore turn to our final duty of proportionality review.

One purpose of proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). To determine whether the sentence of death is disproportionate, we compare this case to other cases that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

We have found the death penalty disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C.

1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 66 U.S.L.W. 3262 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). This case is distinguishable from each of these. First, defendant here was convicted of three murders. This Court has never found a death sentence disproportionate in a multiple-murder case. *State v. Heatwole*, 344 N.C. 1, 30, 473 S.E.2d 310, 325 (1996), *cert. denied,* —— U.S. ——, 137 L. Ed. 2d 339 (1997). Second, all three of defendant's first-degree murder convictions were based on pre-meditation and deliberation, and one was also based on the felony murder rule. We have consistently stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Third, defendant was also convicted of the first-degree rape of his adult victim. "[T]his Court has never found a death sentence disproportionate in a case involving a victim of first-degree murder who was also sexually assaulted." *State v. Penland*, 343 N.C. 634, 666, 472 S.E.2d 734, 752 (1996), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 725 (1997). Finally, there are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to sustain a sentence of death. *Bacon*, 337 N.C. at 110 n.8, 446 S.E.2d at 566 n.8. The jury found all four in this case: the (e)(3) and (e)(11) circumstances with regard to all three murders, the (e)(5) circumstance with regard to the murder of the adult victim, and the (e)(9) circumstance with regard to the murder of one of the child victims.

We conclude that the present case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate or those in which juries have returned recommendations of life imprisonment. We conclude that the sentence of death is not disproportionate and hold that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error.

NO ERROR.

**STATE v. RICHMOND**

[347 N.C. 412 (1998)]

Justice FRYE dissenting.

I join Justice Webb's dissenting opinion, but with one caveat. *State v. Robinson*, 339 N.C. 263, 451 S.E.2d 196 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995), seems at odds with *State v. Bond*, 345 N.C. 1, 478 S.E.2d 163 (1996), *cert. denied*, —— U.S. ——, 138 L. Ed. 2d 1022 (1997). Because *State v. Bond* is the more recent case, I would follow it.

Justice WEBB dissenting.

I dissent because I believe there were two errors in the trial requiring a new sentencing proceeding.

At a pretrial conference, the State indicated that if the defendant was found guilty, it would introduce evidence at the sentencing proceeding that the defendant had previously been convicted of first-degree murder and rape. The defendant's attorney then told the court that he wished to inform the jury during the *voir dire* that the defendant had been convicted previously of first-degree murder and ask each prospective juror whether he or she could still consider the mitigating circumstances before rendering a verdict. The court held that this would be a stake-out question and would not allow it.

Counsel may not pose hypothetical questions designed to elicit in advance what a juror's decision will be under a certain state of evidence or upon a given state of facts. Such questions tend to stake out the juror and cause him to pledge himself to a future course of action. *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976). In *State v. Bond*, 345 N.C. 1, 17, 478 S.E.2d 163, 170-71 (1996), *cert. denied*, —— U.S. ——, 138 L. Ed. 2d 1022 (1997), we held it was not a stake-out question when the district attorney during *voir dire* informed the jury of uncontroverted facts and asked the jurors whether they could impose the death penalty in view of these uncontroverted facts.

I believe we are bound by *Bond*. As in *Bond*, the defendant in this case wanted to inform the jurors of uncontroverted facts and ask them how these facts would affect their votes. He should have been allowed to do so.

The majority attempts to distinguish *Bond* from this case. It acknowledges that the predicate for this State's inquiry in

*Bond* involved an uncontroverted fact, but says this indicates only this Court's conclusion that the superior court did not abuse its discretion. The majority reads something in *Bond* that I do not read. As I read *Bond,* we held that if the jurors are informed of an uncontroverted fact and are asked how this fact would affect their votes, the question is not hypothetical and is not a stake-out question.

The majority contends that this case is governed by *State v. Robinson,* 339 N.C. 263, 273, 451 S.E.2d 196, 202 (1994), *cert. denied,* 515 U.S. 1135, 132 L. Ed. 2d 818 (1995), in which we held it was an improper stake-out question to ask a juror if he could follow the judge's instructions and consider life in prison as a sentencing option if the juror found that the defendant had committed a murder in addition to the three for which he was being tried. This case is distinguished from *Robinson* in that the matter about which the defendant wanted to inquire in *Robinson* was controverted.

I also believe it was error for the superior court not to grant the defendant's request to instruct the jury that he is ineligible for parole under his federal sentence. The majority says this was unnecessary because the State's argument in regard to future dangerousness was limited to dangerousness while the defendant is in prison. I cannot agree. When the prosecuting attorney argued that "[t]here is only one way you can ensure that this Defendant does not kill again, and that is to impose the . . . death penalty," I believe *Simmons v. South Carolina,* 512 U.S. 154, 129 L. Ed. 2d 133 (1994), required that the court instruct the jury as requested by the defendant. I do not believe this statement was so related to a previous argument that the jury would know the prosecuting attorney was referring only to killings in prison.

I vote for a new sentencing proceeding. *State v. Conner,* 335 N.C. 618, 440 S.E.2d 826 (1994).